The People appealed this ruling to the Adams County District Court pursuant to section 13–6–310, C.R.S.1973, and Crim.P. 37. The district court dismissed the appeal, holding that there was no final judgment from which an appeal could be taken.

The PEOPLE of the State of Colorado, Petitioner-Appellee,

In the Interest of A. M. D. and M. D., Children, And Concerning, D. D., Respondent-Appellant.

No. 81SA145.

Supreme Court of Colorado, En Banc.

July 19, 1982.

Earl G. Rhodes, Asst. Weld County Atty., Greeley, for petitioner-appellee.

James H. Hiatt, Fort Collins, for respondent-appellant.

PER CURIAM.

This appeal involves the termination of the parental relationship between a mother, D. D., and her two children, A. M. D. and M. D. The Weld County District Court adjudicated the children dependent or neglected, and later entered an order terminating the parent-child relationships pursuant to section 19–11–105, C.R.S.1973 (1978 Repl.Vol. 8), which has been construed to authorize an order of termination under the preponderance of the evidence standard.[1] Because that standard, as so applied, violates due process of law under the Fourteenth Amendment to the United States Constitution, we reverse the order of termination and remand for a new trial.

### I. Facts

D. D. is the mother of two minor children, a six-year-old daughter, A. M. D., and a four-year-old son, M. D. The whereabouts of the children's fathers is unknown. In August 1976, D. D. moved to Weld County, Colorado, from Dubuque, Iowa, where she had been supervised by the Dubuque County Department of Social Services. That agency became involved with D. D. when it received a neglect referral from a hospital to which A. M. D. had been brought for treatment. In December 1976, the Weld County Department of Social Services (department) commenced supervision of D. D. at the request of the Dubuque Department of Social Services. The principal caseworker assigned to supervise D. D. in Weld County was Mrs. Frankie Perdue.

In December 1977, M. D. was hospitalized at Weld County General Hospital and diag-

---

1. Although the Parent-Child Legal Relationship Termination Act of 1977, section 19–11–101 *et seq.*, C.R.S.1973 (1978 Repl. Vol. 8), does not specify the standard of proof required to terminate a parent-child relationship, the Colorado Court of Appeals has held that the quantum of proof is by a preponderance of the evidence. In *People in the Interest of B. J. D.*, 626 P.2d 727, 729 (Colo.App.1981), the court stated:

Termination of the parent-child legal relationship is governed by § 19–11–101 *et seq.*, C.R.S.1973 (1978 Repl. Vol. 8) of the Childrens Code, specifically § 19–11–105, C.R.S.1973 (1978 Repl. Vol. 8). However, the Childrens' Code does not specify the quantum of proof required to terminate the parent-child relationship. Nevertheless, C.R.J.P. 1 states that:

"Proceedings are civil and where not governed by these rules or the procedures set forth in Title 19, C.R.S.1973, as amended, shall be conducted according to Colorado Rules of Civil Procedure."

Therefore, we must apply § 13–25–127, C.R.S.1973, which declares that the burden of proof in any civil action shall be by a preponderance of the evidence.

*See also People in the Interest of C. A. K.*, Colo.App., 628 P.2d 136 (Colo.App.1980), *cert. granted*, Colo.Sup.Ct. No. 81SC85.

nosed as a "failure to thrive" baby because of inadequate weight gain since his birth. M. D.'s treating physician contacted Mrs. Perdue and recommended that M. D. be placed in foster care until his weight increased. Mrs. Perdue filed a dependency or neglect petition, and M. D. was temporarily placed in the custody of the department. The department placed M. D. in a foster home, where his weight increased to within the normal range. A. M. D. also had been residing in a series of foster homes, at D. D.'s request, since March 1977.

The children were returned to D. D.'s care in March 1978 after she expressed a willingness to provide for them and to seek counselling. On June 8, 1978, D. D. left the children at a day care center and was not at home when workers from the center made repeated attempts to deliver the children to her later in the day. The children were placed in a receiving home, and the department petitioned for and was granted temporary custody on June 12, 1978. Shortly thereafter the department filed an amended petition alleging that both A. M. D. and M. D. were dependent or neglected children. The court appointed an attorney for D. D. and a guardian ad litem for the children.

On January 17, 1979, the department amended its petition to allege that the children were dependent or neglected because D. D. had "on numerous occasions voluntarily placed the children in the custody of the Weld County Department of Social Services and [D. D.] has been unable to provide a home which can continuously provide the necessary care for the subject children." D. D. admitted the allegations of the amended petition. The court then found that the children were dependent or neglected and approved a six-month treatment plan which included requirements that D. D. participate in mental health sessions, attend classes to improve her skills as a parent, and submit to a physical examination to determine whether her physical condition impaired her parental ability. The court deferred entry of a decree of dependency or neglect, and the children were continued in the custody of the department.

On July 11, 1979, the People moved to terminate the parent-child relationship, alleging that D. D. had not complied with the treatment plan, she was an unfit parent, and the conduct that had resulted in the finding of dependency or neglect was unlikely to change within a reasonable period of time. On July 20, 1979, the district court formally adjudicated the children as dependent or neglected and ordered that they remain in the custody of the department. A termination hearing was held in February 1980. During the termination hearing a dispositional report prepared by the department caseworker, Mrs. Perdue, was admitted into evidence over D. D.'s hearsay objection. Also admitted into evidence, without objection, was a report by the Children's Diagnostic Center of the University of Colorado Medical Center to which the court had referred D. D. and her children for an evaluation. Both the department and the Children's Diagnostic Center recommended that D. D.'s parental rights be terminated. On February 22, 1980, the court orally ruled from the bench at the conclusion of the evidence and terminated D. D.'s parental rights. On February 27, 1980, five days after its oral ruling, the court entered a written order, *nunc pro tunc* February 22, terminating the parent-child relationships between D. D. and her two children, A. M. D. and M. D. In support of this disposition the court set forth conclusions in accordance with the statutory criteria for termination contained in section 19–11–105, C.R.S.1973 (1978 Repl.Vol. 8).

D. D. filed a motion for a new trial on March 7, 1980, alleging principally the insufficiency of evidence to support the court's order of termination. The People objected to the motion as untimely because it had been filed more than 14 days, rather than within 10 days, after the court's oral ruling on February 22, 1980. On June 3, 1980, after a hearing, the court denied the motion for a new trial. In a later ruling on D. D.'s motion for enlargement of the time for filing a new trial motion, the court elaborated on its denial of D. D.'s new trial motion, stating:

When I ruled on the Motion for New Trial on June third, I ruled on the merits and I did not deny the Motion . . . on the ground that it was untimely filed. At that time, although not announced, my view was . . . that the ten day period commenced to run on February 27, the day I signed the order terminating parental rights, although it was nunc pro tunc as of February 22.

That being the case, the Motion was filed on the 9th day, within the ten day period provided by the rules.

Although several issues have been raised on this appeal, our disposition renders it unnecessary to address all of them.[2] We consider first the People's contention that D. D.'s motion for a new trial was not timely filed and therefore D. D.'s appeal should be dismissed. Next we address D. D.'s assertion that she was not adequately advised of her constitutional and other legal rights as required by statute. We then turn to D. D.'s argument that use of the preponderance of the evidence standard in the adjudicatory and dispositional stages of a dependency or neglect proceeding in which termination of parental rights is sought violates due process of law, and finally consider D. D.'s contention that the court erred in admitting into evidence the department's dispositional report and the evaluative report prepared by the Children's Diagnostic Center.

## II. The Motion for a New Trial.

The People initially argue that D. D.'s appeal should be dismissed because her motion for a new trial was untimely filed. We disagree.

■ The time for filing a motion for a new trial commences on the date of the entry of the final judgment or, in this case, the decree of termination. *People in the Interest of E. A.*, 638 P.2d 278 (Colo.1981); *People in the Interest of F. M.*, Colo.App., 609 P.2d 1123 (1980). Although C.R.J.P. 20(a) was repealed effective July 1, 1980, it nevertheless governed the time for filing a motion for a new trial in this proceeding. The rule provided:

A motion for new trial or rehearing shall be in writing and shall be made within ten days of entry of the order or decree unless time is enlarged by the court. It shall state the particulars in which the order or decree is in error and the grounds for such motion.

The Rules of Juvenile Procedure are silent on the entry of a judgment or decree. Under C.R.J.P. 1 we therefore must look to the Rules of Civil Procedure, particularly C.R. C.P. 58(a),[3] for guidance on this matter.

**2.** Our reversal of the termination order and remand for a new trial renders it unnecessary to consider the following claims of D. D.: the evidence was insufficient to support the termination order; the court did not make available to D. D. "at least fifteen days prior to the [termination hearing]," as required by section 19-11-107(2), C.R.S.1973 (1978 Repl. Vol. 8), a report of a psychiatric evaluation of her conducted by a court appointed psychiatrist; and the court failed to consider and adopt a less drastic alternative to termination.

**3.** C.R.C.P. 58(a) provides:
Subject to the provisions of Rule 54(b): (1) Upon a general verdict of a jury, or upon a decision by the court that a party shall recover only a sum certain or costs, or that all relief shall be denied, the clerk, unless the court otherwise orders, shall forthwith prepare and enter the judgment on the register of actions as provided in Rule 79(a) without awaiting any direction by the court; (2) upon a decision by the court granting other relief, or upon a special verdict, or a general verdict accompanied by answers to interrogatories, the court shall promptly prepare a written form of the judgment, and the clerk shall thereupon enter it on the register of actions as provided by Rule 79(a); (3) the date the judgment is ordered in open court, in chambers, or under the provisions of Rule 55 regarding default, shall be the effective date of entry of judgment regardless of when noted in the register of actions. The notation in the register of actions shall show the date the judgment was entered as the effective date of the judgment. If judgment is entered under the provisions of this rule when counsel or any party not represented by counsel is not present, except as provided for in Rule 55, the clerk of the court shall mail a written notice of the entry of the judgment, a copy of the order, or some other advisement, showing the date of the order, to counsel of record, or if a party who has appeared has no counsel, to the party. Money judgments shall also be entered in the judgment record as provided for in Rule 79(d). Entry of the judgment shall not be delayed for the taxing of costs.

It is clear in this case that the court did not intend its oral ruling of February 22, 1980, to be the judgment in the case. In fact, because the court believed that no judgment had been entered on this occasion, it refused to dismiss D. D.'s motion for a new trial as untimely filed and instead denied it on its merits. C.R.C.P. 58(a)(2) provides, in pertinent part, that upon a decision by the court granting relief—other than relief in the form of a general jury verdict, or a sum certain or costs, or a denial of all relief—"the court shall promptly prepare a written form of the judgment, and the clerk shall thereupon enter it on the register of actions as provided by Rule 79(a)." Under the circumstances of this case we believe the court's written decree of February 27, 1980, which expressly "ordered, adjudged and decreed" that the parental relationship between D. D. and her children "be and hereby is terminated for all time," constitutes "a written form of the judgment" within the intendment of C.R.C.P. 58(a)(2). *See, e.g., Poor v. District Court*, 190 Colo. 433, 549 P.2d 756 (1976); *In re Marriage of Gardella*, 190 Colo. 402, 547 P.2d 928 (1976); *Joslin Dry Goods Co. v. Villa Italia, Ltd.*, 35 Colo.App. 252, 539 P.2d 137 (1975). Since D. D.'s motion for a new trial was filed within ten days after the court's written decree, we hold that the motion was timely filed. *Id.* Thus the trial court was not deprived of jurisdiction to rule on the merits of the motion, nor is this court deprived of jurisdiction to hear this appeal.

### III. *The Advisement of Rights*

D. D. contends that the decree of dependency or neglect and the subsequent order terminating parental rights are fatally flawed because the trial court did not advise her of her constitutional and legal rights on her first appearance before the court as required by statute. We disagree.

Section 19–1–106(1)(a), C.R.S.1973 (1978 Repl. Vol. 8) provides:

> At his first appearance before the court, the child and his parents, guardian, or other legal custodian shall be fully advised by the court of their constitutional and legal rights, including the right to a jury trial as provided in subsection (4) of this section and the right to be represented by counsel at every stage of the proceedings.

D. D. first appeared before the court on December 20, 1977, at a hearing to determine whether the court should authorize the filing of a petition in dependency or neglect with respect to D. D.'s son, M. D. *See* section 19–3–101(2), C.R.S.1973 (1978 Repl.Vol. 8). The court explained the proceeding in general to D. D.; informed her that the department was requesting temporary custody of M. D.; advised D. D. that she was entitled to be represented by a lawyer, that if she could not hire a lawyer "frequently Colorado Rural Legal Services ... handles these cases," and that if necessary the court would give consideration to appointing a lawyer. D. D. said she would go to see Colorado Rural Legal Services.[4]

M. D. had come to the court's attention after being admitted to Weld County General Hospital for failure to thrive. D. D. agreed that the department should be granted temporary custody of M. D. to permit the child's lack of normal weight gain to be addressed. After hearing testimony, the court authorized the filing of the petition, and D. D. agreed to waive service of the summons. Above her signed waiver is a recital of various constitutional and legal

Attorneys shall not submit forms of judgment except upon direction of the court, and these directions shall not be given as a matter of course. If the court makes an oral ruling from the bench and directs counsel to prepare a written order of judgment, the judgment shall not be entered or be effective until the court signs the written order of judgment. However, a notation in the register of actions shall reflect the nature of the oral ruling and the directions to counsel. Thereafter, upon the signing of the written order, the judgment shall be entered and be effective.

4. D. D. initially contended that the trial court proceedings were defective because a verbatim record was not made of the first appearance hearing. *See* section 19–1–107(3), C.R.S.1973 (1978 Repl. Vol. 8). Later a supplemental record was filed, and, in her reply brief, D. D. has retracted this assertion of error.

rights, including the right to a jury trial and the right to be represented by counsel, but the record does not establish whether she read the recital.

The petition was not brought forward to hearing until M. D. had been returned to D. D.'s care and new problems had developed, resulting in removal of A. M. D. and M. D. from the parental home and the filing of an amended petition in dependency or neglect. On June 12, 1978, when the court authorized the amended petition to be filed, it appointed counsel for D. D. At all times thereafter, D. D. was represented by counsel.

■■■ Proceedings in dependency or neglect affect important rights, so there must be substantial compliance with statutory requirements for conduct of those proceedings. *Storey v. Shumaker*, 131 Colo. 131, 279 P.2d 1057 (1955). In order to assure the effectiveness of the statutorily mandated advisement and to provide a basis for informed appellate review, the trial court should explain the constitutional and legal rights of the parties to them orally on the record. In this case that was not done. However, counsel was appointed for D. D. before the amended petition was filed, and he represented her throughout the proceedings. A guardian ad litem was appointed for both children.

We perceive no prejudice to D. D. resulting from any imperfections in her advisement. D. D. did not assert error in the initial advisement in her motion for a new trial. Under these circumstances, we reject her contention that the challenged advisement fatally infects the adjudication of dependency or neglect and the subsequent order terminating parental rights.

### IV. *The Standard of Proof*

The issue central to D. D.'s appeal is whether the termination of her parental rights under a preponderance of the evidence standard violates due process of law. Although D. D. failed to raise the due process clause in her motion for a new trial, we nevertheless elect to address it because of the constitutional proportions of the issue. *See Robinson v. People*, 173 Colo. 113, 476 P.2d 262 (1970). The function of a particular standard of proof is "to allocate the risk of error between the litigants and to indicate the relative importance attached to the ultimate decision." *Addington v. Texas*, 441 U.S. 418, 423, 99 S.Ct. 1804, 1808, 60 L.Ed.2d 323, 329 (1979); *see also In re Winship*, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970). Thus, the standard of proof directly influences the basic reliability of the factfinding decision concerning termination and clearly affects the substantial rights of the parties to the termination decree.

■■ D. D. argues that any standard less than proof beyond a reasonable doubt would be constitutionally flawed under due process standards. While we agree that the preponderance of the evidence standard violates due process of law, we do not mandate that the factual basis for termination of parental rights be established by proof beyond a reasonable doubt. Rather, consistent with the United States Supreme Court's recent decision in *Santosky v. Kramer*, —— U.S. ——, 102 S.Ct. 1388, 71 L.Ed.2d 599, (1982) (*Santosky*), we hold that clear and convincing evidence is the appropriate constitutional standard of proof in proceedings involving termination of a parent-child relationship.

### A.

On March 24, 1982, the United States Supreme Court held in *Santosky* that before a parent-child relationship may be terminated due process of law requires that the state support the alleged grounds for termination by a standard of proof no less demanding than clear and convincing evidence. In *Santosky* the Court examined New York's statutory procedure for terminating parental rights, which it summarized as follows:

New York authorizes its officials to remove a child temporarily from his or her home if the child appears "neglected," within the meaning of Art. 10 of the Family Court Act. See §§ 1012(f), 1021–1029. Once removed, a child under the

age of 18 customarily is placed "in the care of an authorized agency," Soc.Serv. Law § 384–b.7.(a), usually a state institution or a foster home. At that point, "the state's first obligation is to help the family with services to . . . reunite it. . . ." § 384.b.1.(a)(iii). But if convinced that "positive, nurturing parent-child relationships no longer exist," § 384–b.1.(b), the State may initiate "permanent neglect" proceedings to free the child for adoption. The State bifurcates its permanent neglect proceeding into "fact-finding" and "dispositional" hearings. Fam.Ct.Act §§ 622, 623. At the factfinding stage, the State must prove that the child has been "permanently neglected," as defined by Fam.Ct.Act §§ 614.1.(a)–(d) and Soc. Serv. Law § 384–b.7.(a). See Fam.Ct. Act § 622. The Family Court judge then determines at a subsequent dispositional hearing what placement would serve the child's best interests. §§ 623, 631.

At the factfinding hearing, the State must establish, among other things, that for more than a year after the child entered state custody, the agency, "made diligent efforts to encourage and strengthen the parental relationship." Fam.Ct.Act §§ 614.1.(c), 611. The State must further prove that during that same period, the child's natural parents failed "substantially and continuously or repeatedly to maintain contact with or plan for the future of the child although physically and financially able to do so." § 614.1(d). Should the State support its allegations by "a fair preponderance of the evidence," § 622, the child may be declared permanently neglected. § 611. That declaration empowers the Family Court judge to terminate permanently the natural parents' rights in the child. §§ 631(c), 634. Termination denies the natural parents physical custody, as well as the rights ever to visit, communicate with, or regain custody of the child. —— U.S. at ——, 102 S.Ct. at 1391–92, 71 L.Ed.2d at 603 (footnote omitted).

In *Santosky* the Supreme Court first considered "whether process is constitutionally due a natural parent at a State's parental rights termination proceeding." —— U.S. at ——, 102 S.Ct. at 1394, 71 L.Ed.2d at 606. In holding that it was, the Court stated:

> The fundamental liberty interest of natural parents in the care, custody, and management of their child does not evaporate simply because they have not been model parents or have lost temporary custody of their child to the State. Even when blood relationships are strained, parents retain a vital interest in preventing the irretrievable destruction of their family life. If anything, persons faced with forced dissolution of their parental rights have a more critical need for procedural protections than do those resisting state intervention into ongoing family affairs. When the State moves to destroy weakened familial bonds, it must provide the parents with fundamentally fair procedures. *Id.*

The Court next addressed "what process is due" the natural parent and, in this context, balanced the three distinct factors specified in *Mathews v. Eldridge*, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976) for resolving an inquiry of this sort; the nature of the private interests affected by the proceeding; the risk of an erroneous deprivation of the private interests as a result of the state's chosen procedure and the countervailing governmental interests supporting the use of the challenged procedure. Because "a natural parent's 'desire for and right to "the companionship, care, custody, and management of his or her children" ' is an interest far more precious than any property right," —— U.S. at ——, 102 S.Ct. at 1397, 71 L.Ed.2d at 610, quoting from *Lassiter v. Department of Social Services*, 452 U.S. 18, 27, 101 S.Ct. 2153, 2160, 68 L.Ed.2d 640, 649 (1981),[5] the Court found that the parents' interest weighed heavily

---

**5.** *Lassiter*, in turn, quoted from *Stanley v. Illinois*, 405 U.S. 645, 651, 92 S.Ct. 1208, 1212, 31 L.Ed.2d 551, 558 (1972).

against the use of the preponderance of the evidence standard. Under the New York statutory scheme, a finding of permanent neglect could cut off forever the natural parents' right to their child. Given this potential consequence, the court had "no difficulty finding that the balance of private interests strongly favors heightened procedural protections" at the hearing on permanent neglect. —— U.S. at ——, 102 S.Ct. at 1398, 71 L.Ed.2d at 611. The Court next found that the preponderance of the evidence standard creates a significant risk of an erroneous termination to the detriment of the natural parent:

A standard of proof that by its very terms demands consideration of the quantity, rather than the quality, of the evidence may misdirect the factfinder in the marginal case. *See In re Winship*, 397 U.S., at 371, n.3 25 L.Ed.2d 368, 90 S.Ct. 1068, 51 Ohio Ops. 2d 323 (Harlan, J., concurring). Given the weight of the private interests at stake, the social cost of even occasional error is sizable.... An elevated standard of proof in a parental rights termination proceeding would alleviate "the possible risk that a factfinder might decide to [deprive] an individual based solely on a few isolated instances of unusual conduct [or] ... idiosyncratic behavior."

—— U.S. at ——, 102 S.Ct. at 1400, 71 L.Ed.2d at 613–14, quoting *Addington v. Texas*, 441 U.S. at 427, 99 S.Ct. at 1810, 60 L.Ed.2d at 321.

Finally, the Court reasoned that a standard of proof more strict than a preponderance of the evidence was consistent with the state's *parens patriae* interest in preserving and promoting the welfare of the child and the government's fiscal and administrative interest in reducing the cost and burden of termination proceedings. The Court's tripartite analysis led it to conclude that due process of law requires the application of the elevated "clear and convincing" standard of proof to proceedings involving the termination of a parent-child relationship.

The Colorado statutory procedure for terminating parental rights is not significantly dissimilar to the New York procedures reviewed in *Santosky*. Sections 19–3–101 *et seq.* and 19–11–101 *et seq.*, C.R.S.1973 (1978 Repl. Vol. 8 and 1981 Supp.), set forth a bifurcated procedure for determining dependency or neglect and ultimately for terminating the parent-child relationship.[6]

Under sections 19–3–101 and 19–3–102, C.R.S.1973 (1978 Repl. Vol. 8), based upon a preliminary investigation ordered by the court, the court may authorize that a proceeding be commenced by the filing of a petition alleging that the child is dependent or neglected and stating that termination of the parent-child relationship is a possible remedy if the petition is sustained. An adjudicatory hearing is then held, at which the state must establish by a preponderance of the evidence that the child is dependent or neglected. Section 19–3–106(1), C.R.S. 1973 (1978 Repl. Vol. 8 and 1981 Supp.). Following an adjudication of dependency or neglect, the court "shall enter a decree of disposition." Section 19–3–111(1), C.R.S. 1973 (1978 Repl. Vol. 8). The dispositional alternatives available to the court are several: placement of legal custody in the natural parents or guardian, with or without protective supervision, under special conditions ordered by the court; placement of legal custody in a suitable third person, with or without protective supervision, under special conditions; placement of legal custody in the county department of social services or a child placement agency for placement in a family care home or other

---

**6.** Section 19–3–109, C.R.S.1973 (1978 Repl. Vol. 8 and 1981 Supp.), provides for a dispositional hearing after an adjudication of dependency or neglect. Under subsection 3(a) of section 19–3–109 the dispositional hearing following an adjudication of dependency or neglect must be continued for good cause on motion of any interested party when termination is a possible remedy. After an adjudication of dependency or neglect, section 19–3–111(2)(a), C.R.S. 1973 (1978 Repl. Vol. 8), permits the court to terminate the parent-child relationship in accordance with sections 19–11–101 *et seq.*, C.R. S.1973 (1978 Repl. Vol. 8 and 1981 Supp.). A "neglected or dependent child" is defined in section 19–1–103(20), C.R.S.1973 (1978 Repl. Vol. 8 and 1981 Supp.), as set forth in full in section IV C 2, *infra.*

child care facility; placement in a hospital or other suitable facility for special care or treatment; or termination of the parent-child relationship. Section 19–3–111, C.R.S. 1973 (1978 Repl. Vol. 8 and 1981 Supp.).

Proceedings for termination are governed by the Parent-Child Legal Relationship Termination Act of 1977, section 19–11–101 *et seq.*, C.R.S.1973 (1978 Repl. Vol. 8 and 1981 Supp.). Following the filing of a written motion alleging the factual grounds for termination, a separate hearing is held to consider termination. Section 19–11–103, C.R.S.1973 (1978 Repl. Vol. 8 and 1981 Supp.). The statutory criteria for termination are contained in section 19–11–105(1), C.R.S. 1973 (1978 Repl. Vol. 8), and, as pertinent here, require the following findings: that the child is adjudicated dependent or neglected; that an appropriate treatment plan approved by the court has not been reasonably complied with by the parent or has not been successful; that the parent is unfit; and that the conduct or condition of the parent is unlikely to change within a reasonable time.[7] The standard of proof for termination is not expressly set out in the termination statute, but judicial decision has established that standard as one of preponderance of the evidence. *People in the Interest of B. J. D.*, 626 P.2d 727 (Colo. App.1981); *People in the Interest of C. A. K.*, 628 P.2d 136 (Colo.App.1980), *cert. granted*, Colo.Sup.Ct. No. 81SC85.[8]

▮▮▮▮ The People present a two-pronged argument that the Colorado statutory procedures and criteria for termination are equivalent to the "clear and convincing" standard of proof. First, the People point to section 19–3–106(1), C.R.S.1973 (1978 Repl. Vol. 8 and 1981 Supp.), which requires the state to prove dependency or neglect by a preponderance of the evidence at the initial adjudicatory hearing, and to section 19–11–105(1)(b)(II), C.R.S. 1973 (1978 Repl. Vol. 8), which requires the state again to prove parental unfitness at the termination hearing. Next, the People rely on the specificity of the statutory criteria for termination in section 19–11–105, and other procedural protections[9] accorded under the Colorado Children's Code, and argue that these statutory provisions supply the equivalent of a clear and convincing standard of proof.

We disagree with the People's contention. The United States Supreme Court rejected a similar argument in *Santosky* where the state urged that New York statutory procedures be evaluated as a "package." The Court observed that "we would rewrite our precedents were we to excuse a constitutionally defective standard of proof based on an amorphous assessment of the 'cumulative effect' of state procedures." —— U.S. at —— n. 9, 102 S.Ct. at 1396 n. 9, 71 L.Ed.2d at 609 n. 9. Because the preponderance of the evidence standard tolerates undue uncertainty in the determination of dispositive facts on the issue of termination, specific statutory criteria and other procedural safeguards simply do not add up to a sufficient equivalent of clear and convincing evidence to protect adequately a natural parent's basic liberty interest in the continuation of the parental relationship. Also, "[s]ince the litigants and the factfinder must know at the outset of a given proceeding how the risk of error will be allocated, the standard of proof necessarily must be calibrated in advance." *Santosky*, —— U.S. at ——, 102 S.Ct. at 1396, 71 L.Ed.2d at 609. Retrospective review of the sufficiency of the evidence is an inadequate substitute for a constitutionally sufficient standard of proof applied to a critical phase of the termination process.

### B.

Although the preponderance of the evidence standard violates due process of law,

---

7. Section 19–11–105, C.R.S.1973 (1978 Repl. Vol. 8 and 1981 Supp.) is set out in full in part IV C 2 of this opinion, *infra*.

8. *See* note 1, *supra*.

9. *See, e.g.*, section 19–11–103(2), C.R.S.1973 (1978 Repl. Vol. 8) (parent has right to appointed counsel); section 19–11–107, C.R.S.1973 (1978 Repl. Vol. 8) (indigent parent has right to one expert witness of his own choice); section 19–11–109, C.R.S.1973 (1978 Repl. Vol. 8) (indigent parent has right to transcript of trial proceeding for use on appeal).

the Supreme Court in *Santosky* left to state legislatures and courts the determination of what precise burden equal to or greater than the "clear and convincing evidence" standard should be made applicable to termination proceedings. In this respect D. D. argues that the only proper evidentiary standard is proof beyond a reasonable doubt. We are persuaded that the clear and convincing evidence standard mandated by *Santosky* is adequate to protect the basic interests of the natural parent and the child in preventing an erroneous termination of their legal relationship.

As the court observed in *Santosky*, the clear and convincing standard "adequately conveys to the factfinder the level of subjective certainty about his factual conclusions necessary to satisfy due process." —— U.S. at ——, 102 S.Ct. at 1402–03, 71 L.Ed.2d at 617. In our view a standard requiring proof beyond a reasonable doubt would not accomplish a significantly greater reduction of the risk of an erroneous deprivation than that to be achieved by the clear and convincing standard. Besides, "termination proceedings often require the factfinder to evaluate medical and psychiatric testimony, and to decide issues difficult to prove to a level of absolute certainty, such as lack of parental motive, absence of affection between parent and child, and failure of parental foresight and progress." *Santosky*, —— U.S. at ——, 102 S.Ct. at 1402, 71 L.Ed.2d at 616–17. We believe the clear and convincing standard strikes an appropriate balance between the risk of an erroneous termination of the parental relationship, on the one hand, and the *parens patriae* interest of the state in promoting the child's welfare, on the other. While the legislature is free to require a greater standard of proof in such cases, we decline to do so under state constitutional doctrine. Because the termination of D. D.'s parental rights was not based upon the clear and convincing standard of proof, a new trial is necessary on the issue of termination of parental rights.

**C.**

■ We now consider whether a decree of dependency or neglect based on facts found by applying a preponderance of the evidence standard can serve as a predicate for termination of parental rights. We conclude this is constitutionally permissible. We view this conclusion as fully consistent with *Santosky* and find it to be supported by application of the *Mathews v. Eldridge, supra*, three factor balancing test for fundamental fairness into the Colorado statutory scheme for termination of parental rights.

**1.**

In Colorado one element which must be established to support termination of parental rights, except in cases where the child has been abandoned, is "[t]hat the child is adjudicated neglected or dependent." Section 19–11–105(1)(b), C.R.S.1973 (1978 Repl. Vol. 8). In order to adjudicate a child neglected or dependent the allegations of the petition must be supported by a preponderance of the evidence. Section 19–3–106, C.R.S.1973 (1978 Repl. Vol. 8 and 1981 Supp.). New York's parental rights termination procedure similarly utilizes a placement determination made by a preponderance of the evidence to support a later termination proceeding. *Santosky* contains no intimation that this feature of New York's termination of parental rights standards offends constitutional requirements.

In New York's bifurcated parental rights termination procedure, a factfinding hearing is first held to determine whether a child has been "permanently neglected." At that hearing it must be determined that an authorized agency having custody of the child for more than a year "made diligent efforts to encourage and strengthen the parental relationship"[10] during that time and that during that same period the parent failed "substantially and continuously

---

**10.** An exception to this requirement applies when "such efforts would be detrimental to the best interests of the child." N.Y. Family Court Act § 614, subd. 1(c) (McKinney Supp. 1976–81).

or repeatedly to maintain contact with or plan for the future of the child, although physically and financially able to do so." N.Y. Family Court Act, §§ 611, 614(1)(b), (c), (d), 622, (McKinney Supp. 1976–81). Thus, placement of a child in the custody of an authorized agency for more than a year is a precondition to termination of parental rights. It is then necessary to inquire how such a placement is accomplished.

In New York, involuntary long-term placement of a child outside the parental home is based upon procedures for adjudication of a child as "abused" or "neglected" that are very similar to Colorado's dependency or neglect proceedings. The factual findings supporting such an adjudication in New York are made by a preponderance of the evidence. N.Y. Family Court Act, §§ 1046(b), 1051 (McKinney 1975). A dispositional hearing is held after adjudication. One dispositional option available to the court is placement of the child with an authorized agency. The N.Y. Family Court Act, §§ 1045, 1052, 1055 (McKinney 1975). Proceedings to terminate parental rights must be commenced by separate petition. N.Y. Family Court Act, § 614 (McKinney Supp. 1976–81). As earlier noted, authorized agency custody of a child for more than one year is an essential element supporting termination of parental rights. Therefore, in New York, similar to Colorado, an adjudication that a child is abused or neglected, based on a preponderance of the evidence, provides the foundation for termination of parental rights.[11]

There is no intimation in *Santosky* that the factual foundation for the requisite adjudication of abuse or neglect must be proved by clear and convincing evidence. The real difference between the Colorado statutes and those of New York in this regard is that Colorado expressly makes the prior adjudication of dependency or neglect an essential element of termination while in New York the necessity for the prior judicial determination that the child is abused or neglected is only implicit. The difference is in form, not substance. The requirements of due process of law do not turn on a difference so insubstantial.

Giving *Santosky* its most expansive reading,[12] it does not address the question of the standard of proof required by due process in the adjudicatory hearing. However, it does establish a principle and a method by which that question can be resolved. The principle is that the State's procedure must be fundamentally fair. The method to assess fairness is the *Mathews v. Eldridge, supra,* three-factor balancing test. Application of that test will demonstrate the due process adequacy of a preponderance of the evidence standard in making an adjudication of dependency or neglect that is later to be used to support an application for termination of parental rights. We now turn to the application of that balancing test.

### 2.

There can be no question but that in Colorado, as in New York, "[i]n parental

11. At least this is so in the usual case. Temporary placements by parental consent, *see* N.Y. Family Court Act § 1021 (McKinney Supp. 1976–81) or based on exigent circumstances, *see* N.Y. Family Court Act §§ 1022–1027, (McKinney 1975 and Supp. 1976–81) could conceivably eventuate in pre-adjudication placements for longer than one year. Other bases for placement are described in N.Y. Social Services Law § 384–b (McKinney Supp. 1981–82). The New York statutes are intricate and extensive. Without an exhaustive review of these statutes, it cannot be asserted with confidence that there are not other avenues by which a child may be placed with an authorized agency for more than one year.

12. In applying the *Mathews v. Eldridge, supra,* balancing test in *Santosky* the Court carefully assessed the three relevant factors in light of the specific New York statutes. From this analysis it might be concluded that each state's statutory scheme for termination of parental rights must be individually tested to determine the due process adequacy of that state's chosen burden of proof. However, the holding of the court is stated more broadly, and the fairest reading of the decision appears to be that due process requires at least a clear and convincing evidence standard be applied to parental rights termination criteria in all states without regard to their individual statutes. *See especially* —— U.S. at —— n.9, 102 S.Ct. at 1396 n. 9, 71 L.Ed.2d at 609 n.9, 50 U.S.L.W. at 4336.

rights termination proceedings, the private interest affected is commanding." *Santosky,* —— U.S. at ——, 102 S.Ct. at 1396, 71 L.Ed.2d at 609. Considered in isolation, the first *Mathews v. Eldridge* factor—the private interests affected—weighs against the use of the preponderance standard at any necessary step in a termination of parental rights proceeding.

In considering the second factor—the risk of error from using a preponderance standard—however, we conclude that the increased risk of erroneous termination of parental rights that will be introduced by use of a preponderance of the evidence standard at the adjudicatory hearing would be minimal at most. The risk of error in question is the risk of erroneous fact finding. *Santosky v. Kramer, supra.* In a more focused sense, the truly relevant risk is that facts of central significance to the appropriateness of termination of parental rights will be incorrectly determined. Colorado's termination standards, which today we hold must be established by clear and convincing evidence before parental rights can be terminated, are set forth as follows in section 19–11–105, C.R.S.1973 (1978 Repl. Vol. 8 and 1981 Supp.):

(1) The court may order a termination of the parent-child legal relationship upon the finding of either of the following:

(a) That the child has been abandoned by his parent or parents as set forth in section 19–3–111(3);

(b) That the child is adjudicated dependent or neglected and all of the following exist:

(I) That an appropriate treatment plan approved by the court has not been reasonably complied with by the parent or parents or has not been successful;

(II) That the parent is unfit;

(III) That the conduct or condition of the parent or parents is unlikely to change within a reasonable time.

(2) In determining unfitness, conduct, or condition, the court shall find that continuation of the legal relationship between parent and child is likely to result in grave risk of death or serious injury to the child or that the conduct or condition of the parent or parents renders the parent or parents unable or unwilling to give the child reasonable parental care. In making such determinations, the court shall consider, but not be limited to, the following:

(a) Emotional illness, mental illness, or mental deficiency of the parent of such duration or nature as to render the parent unlikely within a reasonable time to care for the ongoing physical, mental, and emotional needs of the child;

(b) Conduct towards the child of a physically or sexually abusive nature;

(c) History of violent behavior;

(d) A single incident of life-threatening or gravely disabling injury or disfigurement of the child;

(e) Excessive use of intoxicating liquors or controlled substances, as defined in section 12–22–303(7), C.R.S.1973, which affect the ability to care and provide for the child;

(f) Neglect of the child;

(g) Long-term confinement of the parent;

(h) Injury or death of a sibling due to proven parental abuse or neglect;

(i) Reasonable efforts by child-caring agencies which have been unable to rehabilitate the parent or parents.

(3) In considering any of the factors in subsection (2) of this section in terminating the parent-child legal relationship, the court shall give primary consideration to the physical, mental, and emotional conditions and needs of the child. The court shall review and order, if necessary, an evaluation of the child's physical, mental, and emotional conditions.

The strength of the statutorily-mandated showing as to the inappropriateness of continuation of the parent-child relationship is manifest from a reading of the statute. It hardly can be maintained that a parent-child relationship should be continued when it has been shown by clear and convincing evidence that a child has been abandoned by his parent, section 19–11–105(1)(a); or that the parent is unfit, an appropriate

treatment plan has been tried without success, and the conduct or condition of the parent is unlikely to change within a reasonable time, section 19–11–105(1)(b). When one of these two sets of alternative findings has been made and is supported by clear and convincing evidence, the risk is insignificant that the resulting termination of parental rights is inappropriate. To impose an additional requirement that the underlying adjudication of dependency or neglect be supported by clear and convincing evidence is not necessary to protect the private interests affected.

While this additional requirement would protect against an error in the original adjudication, we must consider the criteria for establishment of dependency or neglect and compare them with the termination standards in order to assess the importance of that possible error. Section 19–1–103(20), C.R.S.1973 (1978 Repl. Vol. 8 and 1981 Supp.) sets forth the definition of "neglected or dependent child."

(20) "Neglected or dependent child" or "dependent or neglected child" means a child:

(a) Whose parent, guardian, or legal custodian has abandoned him or has subjected him to mistreatment or abuse or whose parent, guardian, or legal custodian has suffered or allowed another to mistreat or abuse the child without taking lawful means to stop such mistreatment or abuse and prevent it from recurring;

(b) Who lacks proper parental care through the actions or omissions of the parent, guardian, or legal custodian;

(c) Whose environment is injurious to his welfare;

(d) Whose parent, guardian, or legal custodian fails or refuses to provide proper or necessary subsistence, education, medical care, or any other care necessary for his health, guidance, or well-being;

(e) Who is homeless, without proper care, or not domiciled with his parent, guardian, or legal custodian through no fault of such parent, guardian, or legal custodian;

(f) Who has run away from home, or is otherwise beyond the control of his parent, guardian, or legal custodian.

It is difficult to conceive any set of circumstances under which the standards for termination of parental rights under section 19–11–105(1)(b) could be met and yet the criteria for adjudication of a child as neglected or dependent would not also be satisfied. Surely if the parent is unfit and likely to remain so, section 19–11–105(1)(b)(II) and (III), a child in the care of that parent would "[lack] proper parental care through the actions or omissions of the parent," section 19–1–103(20)(b), and would be in an "environment ... injurious to his welfare," section 19–1–103(20)(c), and therefore dependent or neglected. *Cf. People in the Interest of D. L. R.*, 638 P.2d 39 (Colo.1981) (It is not necessary to place a child with an inadequate parent to demonstrate that the child "lacks" proper parental care; "lacks" must be read to include "will lack" in construing the statutory dependency or neglect standards). Further, for parental rights termination purposes, a parent is unfit only if "continuation of the legal relationship between parent and child is likely to result in grave risk of death or serious injury to the child or ... the conduct or condition of the parent or parents renders the parent or parents unable to unwilling to give the child reasonable parental care." Section 19–11–105(2). A child in the care of such a parent must necessarily be neglected or dependent because his parent "fails or refuses to provide proper or necessary subsistence, education, medical care, or any other care necessary for his health, guidance, or well-being." Section 19–1–103(20)(d).

By requiring that clear and convincing evidence support findings [13] on the termina-

---

**13.** Section 19–11–105(2) requires the court, somewhat interchangeably, to "determine," "find," and "consider" the criteria for termination of parental rights. *See* section IV C 2, *supra.* If the trial court relies on one of the considerations in subsections 19–11–105(2)(a)–(i) or other considerations not specified in the statute to determine or find that termination of parental rights is appropriate, the facts which

tion criteria in section 19–11–105, we accomplish the substantial equivalent of requiring that the child be determined to be neglected or dependent at the time of the termination proceeding. At that time, whether the facts supporting the original dependency or neglect proceeding were accurately found is largely a question of historical interest. The consideration of overriding importance is whether at the time of the termination proceeding severance of the parent-child ties is appropriate. We hold that under Colorado's statutory scheme the accuracy of the findings of fact underlying the original adjudication of dependency or neglect does not approach critical significance in determining this question. Thus, the risk of error in an accurate determination of these facts is not a matter of central importance in the termination proceeding.

The final factor to be weighed in the balance is the governmental interest in favoring a preponderance of the evidence standard at the adjudicatory hearing. In scrutinizing New York's statutes the United States Supreme Court concluded:

> Two state interests are at stake in parental rights termination proceedings—a parens patriae interest in preserving and promoting the welfare of the child and a fiscal and administrative interest in reducing the cost and burden of such proceedings. A standard of proof more strict than preponderance of the evidence is consistent with both interests.

*Santosky,* —— U.S. at ——, 102 S.Ct. at 1401, 71 L.Ed.2d at 615.

The governmental interests reflected in the Colorado statutory scheme, as it relates to utilization of a preponderance of the evidence standard at the adjudicatory hearing, are more extensive and more weighty.

The status of being a neglected or dependent child triggers juvenile court jurisdiction over a child so circumstanced in Colorado. Section 19–1–104(1)(c), C.R.S. 1973 (1978 Repl. Vol. 8). The filing of a petition alleging that a child is dependent or neglected provides a jurisdictional foundation for a court to issue "temporary or-

ders providing for protection, support, or medical or surgical treatment as it deems in the best interest of ... [such] child." Section 19–1–104(3). Until the filing of the petition, the State has very limited authority to take action to protect a neglected or dependent child. *See* section 19–2–101 *et seq.,* C.R.S.1973 (1978 Repl. Vol. 8 and 1981 Supp.) (treating temporary custody, detention, and shelter).

An order adjudicating a child dependent or neglected, however, vests the court with extensive and flexible dispositional remedies, including placement of the child in the legal custody of his parents, relatives or other suitable persons, with or without protective supervision; placement of legal custody of the child in a county department of social services for placement in a child care facility; and ordering physical and psychological examination and treatment of the child and other special care. Section 19–3–111, C.R.S.1973 (1978 Repl. Vol. 8 and 1981 Supp.). The court may also make an order of protection in assistance of, or as a condition of, any decree of disposition. Section 19–3–110, C.R.S.1973 (1978 Repl. Vol. 8 and 1981 Supp.). Termination of parental rights is also a possibility. Section 19–3–111(3), C.R.S.1973 (1978 Repl. Vol. 8 and 1981 Supp.); section 19–11–105, C.R.S.1973 (1978 Repl. Vol. 8 and 1981 Supp.).

In selecting the appropriate disposition the court "shall hear evidence on the question of the proper disposition best serving the interests of the child and the public." Section 19–3–109, C.R.S.1973 (1978 Repl. Vol. 8). In choosing the appropriate remedy the court must be mindful of the legislatively-proclaimed purposes of the Colorado Children's Code, Title 19, C.R.S.1973, set forth in section 19–1–102, C.R.S.1973 (1978 Repl. Vol. 8 and 1981 Supp.):

(1) The general assembly declares that the purposes of this title are:

(a) To secure for each child subject to these provisions such care and guidance, preferably in his own home, as will best serve his welfare and the interests of society;

support the particular consideration must be

proved by clear and convincing evidence.

(b) To preserve and strengthen family ties whenever possible, including improvement of home environment;

(c) To remove a child from the custody of his parents only when his welfare and safety or the protection of the public would otherwise be endangered; and

(d) To secure for any child removed from the custody of his parents the necessary care, guidance, and discipline to assist him in becoming a responsible and productive member of society.

(2) To carry out these purposes, the provisions of this title shall be liberally construed to serve the welfare of children and the best interests of society.

Thus, in Colorado, a dependency or neglect proceeding and the resulting adjudication provide the jurisdictional bases for State intervention to assist the parents and child in establishing a relationship and home environment that will preserve the family unit. Only when conditions have so deteriorated that a child is abandoned, section 19–11–105(1)(a), or a parent is deemed unfit when tested by demanding standards, section 19–11–105(1)(b), is a parent-child relationship to be terminated. Termination is an unfortunate but necessary remedy when all reasonable means of establishing a satisfactory parent-child relationship have been tried and found wanting. It is not a desired outcome for which the State should strive from the inception of a dependency or neglect proceeding.

When a dependency or neglect proceeding is viewed in light of its primary purpose— as helpful and remedial in preserving and mending familial ties—the importance of permitting State intervention on a standard of proof lower than clear and convincing becomes evident. Yet, however sanguine the State may be about prospects for curing the problems which have led to a situation of dependency or neglect, it must bear in mind the possibility that remedial efforts may not be successful and termination of parental rights may prove to be the only adequate remedy to serve the best interests of the child. *See* section 19–3–109(1), C.R.S.1973 (1978 Repl. Vol. 8).

The natural consequence of requiring a clear and convincing evidence standard at the adjudicatory stage as a condition to use of the adjudication to support termination of parental rights would be that the State would be motivated to attempt to meet this standard initially in all cases. If it did not, it would face the possibility that termination ultimately may be the only appropriate disposition, and that this remedy could not be sought until a new adjudicatory hearing employing an elevated standard of proof could be conducted.

The effect of heightening the standard of proof at the adjudicatory stage could be pernicious. Predictably, the State's activities in gathering and presenting evidence to meet the elevated standard would tend to cast the State in the role of an adversary of the parents, bent on permanent destruction of their relationship with their child, rather than in its proper and legislatively-contemplated capacity as a helping intervenor. The extent of the damage this could do to the State's ability to function effectively in treating the causes of dependency or neglect are not susceptible of measurement. We are convinced, however, that it is significant, and conclude that Colorado has a substantial governmental interest in maintaining a preponderance of the evidence standard for all purposes at dependency or neglect adjudicatory hearings.

The product of this three-factor balancing process as applied to Colorado statutes is that the private interest affected will receive full protection, the risk of error in fact finding will not be appreciably increased, and the substantial governmental interest in providing assistance and treatment to help families with dependent or neglected children address the causes of the dependency or neglect will be promoted if the original dependency or neglect determination is made by a preponderance of the evidence. This balancing test demonstrates that the application of the preponderance of the evidence standard for all purposes in the underlying dependency or neglect determination comports with due process of law. We do not read *Santosky* to mandate a higher standard under these circumstances.

■ We hold that due process of law is accorded to the parties to a termination of parental rights proceeding under Colorado law when the grounds for termination under section 19–11–105 are established by clear and convincing evidence and the underlying dependency or neglect determination is established by a preponderance of the evidence.[14]

### V. *Evidentiary Issues*

D. D. also claims that the court's admission into evidence of the dispositional report prepared by the caseworker, Mrs. Perdue, and the evaluation report prepared by Harry Folk, a psychiatric social worker for the Children's Diagnostic Center, violated her constitutional right of cross-examination, *U.S.Const.* Amend. VI; *Colo.Const.* Art. II, Sec. 16, and her right to due process of law, *U.S.Const.* Amend. XIV; *Colo.Const.* Art. II, Sec. 25. Although D. D. objected at trial and asserted error in her motion for new trial only with respect to the report prepared by Mrs. Perdue, we address the admissibility of both exhibits because of the likelihood that this issue will arise again upon retrial.

■ Section 19–1–108(2), C.R.S.1973 (1978 Repl. Vol. 8), authorizes the admission of written reports and other material relating to a child's mental, physical, and social history for the purpose of determining proper disposition of the child, provided that the person "who wrote the report or prepared the material appear as a witness and be subject to both direct and cross-examination" upon the request of any interested party or upon order of court. The admission of such reports into evidence pursuant to statute violates neither constitutional confrontation requirements[15] nor due process of law where the reports are made available to all interested parties sufficient-ly in advance of the termination hearing to permit the parties to compel the attendance of the persons who wrote the reports or prepared the materials therein and to subject them to examination under oath. *Aylor v. Aylor*, 173 Colo. 294, 478 P.2d 302 (1970); *People in the Interest of A.R.S.*, 31 Colo.App. 268, 502 P.2d 92 (1972). In this case both Mrs. Perdue and Mr. Folk, the authors of the respective reports, were subjected to extensive cross-examination by D. D.'s counsel.

■ Upon retrial, dispositional and evaluative reports which fall within the purview of section 19–1–108 may be admitted into evidence so long as the reports are furnished to counsel in advance of the termination hearing, section 19–11–107(2), C.R.S.1973 (1978 Repl. Vol. 8), and the persons who wrote the reports or prepared the material contained therein are available for direct or cross-examination upon the request of D. D. or any other interested party.

The judgment is reversed and the cause is remanded for a new trial consistent with the views expressed herein.

QUINN, J., concurs in part and dissents in part.

HODGES, C. J., does not participate.

QUINN, Justice, concurring in part and dissenting in part:

I concur in the reversal of the judgment and the remand for a new trial. I disagree with Part IV C of the court's opinion which holds that a decree terminating parental rights may be entered even though the underlying dependency adjudication has been established by a preponderance of evidence only. In my view due process of law requires that the dependency adjudication be established by clear and convincing evidence before it may be used as the basis for

---

**14.** While the underlying adjudication of dependency or neglect need be conducted only under a preponderance of the evidence standard, the fact of an earlier dependency or neglect adjudication must be established by clear and convincing proof at a subsequent termination of parental rights proceeding since the existence of a dependency or neglect adjudica-tion is an essential prerequisite to termination under section 19–11–105(1)(b), C.R.S.1973 (1978 Repl. Vol. 8).

**15.** *U.S.Const.* Amend. VI and *Colo.Const.* Art. II, Sec. 16, by their terms, relate to "criminal prosecutions" only.

terminating parental rights under section 19–11–105, C.R.S.1973 (1978 Repl. Vol. 8 and 1981 Supp.).

## I.

Section 19–11–105(1) makes clear that the only grounds for a termination decree are abandonment, which is not applicable here, and a prior adjudication of dependency or neglect. Indeed, the majority recognizes that the dependency adjudication in Colorado serves as an essential element of any termination decree. The majority, by balancing this critical element against the other statutory criteria for termination in section 19–11–105(1), reasons that these other statutory criteria, when proven by clear and convincing evidence, "accomplish the substantial equivalent of requiring that the child be determined to be neglected or dependent at the time of the termination proceeding." I cannot accept this balancing process which the majority utilizes in upholding the preponderance of evidence standard for a dependency adjudication leading directly to the termination of the parent-child relationship. I read *Santosky v. Kramer,* —— U.S. ——, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982), to require as a matter of due process that the elevated standard of clear and convincing evidence be applied to any dispositive fact which leads directly to the termination of parental rights. In Colorado the dependency adjudication is such a dispositive fact.

As the majority explains, New York's statutory procedures reviewed in *Santosky* permitted the court, upon the filing of the petition alleging abuse or neglect, to order the temporary removal of the child from the parent's home. *N.Y. Family Court Act* §§ 1021–29 (McKinney Supp. 1976–81). Although the initial finding of abuse or neglect was made under the preponderance of evidence standard, *N.Y. Family Court Act* §§ 1046(b), 1051 (McKinney Supp. 1976–81), it was not this finding which led directly to a termination decree. Rather, a permanent neglect proceeding first had to be commenced before the court was permitted to terminate parental rights. *N.Y. Social Services Law* § 384–b(3)(b) and 7(a) (McKinney Supp. 1981–82); *N.Y. Family Court Act* § 614 (McKinney Supp. 1976–81). Upon the filing of a permanent neglect petition, New York law required the court to hold two hearings: a factfinding hearing in order to determine under the preponderance of evidence standard whether the child has been permanently neglected and whether the state has made diligent efforts to encourage and strengthen the parental relationship, *N.Y. Social Services Law* § 384–b(3)(g) and (7)(a) (McKinney Supp. 1981–82); *N.Y. Family Court Act* §§ 614, 622 (McKinney Supp. 1976–81); and next, a dispositional hearing to determine what course of action will be in the best interests of the child, *N.Y. Family Court Act* §§ 623, 631 (McKinney Supp. 1976–81).

I do not consider the initial finding of abuse or neglect under the New York procedure reviewed in *Santosky* as the substantive equivalent of the Colorado dependency adjudication. Although this finding permitted the New York court to order the temporary removal of the child from the natural parent's home, it was not a dispositive fact in the subsequent termination proceeding. Rather, it was the finding of permanent neglect which was critical to a termination decree and, as New York procedure permitted this finding of permanent neglect to be made by a preponderance of evidence only, it was constitutionally flawed.

I consider the Colorado adjudication of dependency a critical element of a termination proceeding and, in a fashion similar to the New York finding of permanent neglect, I believe that the dependency adjudication in Colorado likewise must be made by the constitutionally mandated clear and convincing standard. If anything, the New York hearing on permanent neglect was more protective of the natural parent's rights than the Colorado procedure. The New York procedure required a finding of *permanent neglect,* which is far more indicative of an irreparable parental unfitness than a Colorado dependency adjudication. A Colorado court is permitted to enter a

dependency adjudication upon a showing of *temporary*, as distinguished from permanent, dependency or neglect. This Colorado dependency adjudication assumes a dominant significance to the natural parent's liberty interest in the continuation of the parent-child relationship. The additional statutory components of a termination decree—such as the parent's noncompliance with a treatment plan, present parental unfitness, and the improbability of parental change of condition within a reasonable time, section 19–11–105(1)(b), C.R.S.1973 (1978 Repl. Vol. 8)—are not a justification for balancing these additional elements against the dependency adjudication when that balancing results in undercutting the clear and convincing standard of proof on the essential element of initial dependency. The only balancing constitutionally permissible in this case is the balancing already mandated by *Santosky*—that is, a balancing which protects the natural parent from the risk of an erroneous adjudication on this essential element which serves as the legal basis for a termination proceeding and without which a termination decree cannot enter.

For these reasons I cannot endorse the majority's assertion that under Colorado's statutory scheme the accuracy of the findings of fact underlying the original adjudication of dependency does not approach critical significance to the ultimate decision to terminate the parent-child relationship at the dispositional phase of the case. As I see it, it is precisely because the dependency adjudication implicates the prospective termination of the parental relationship that it assumes critical significance to the subsequent termination proceeding.

At the dependency phase of the case the interests of the parent and the child coalesce. It is the state which juxtaposes itself against the family unit at this stage of the proceeding and seeks judicial intervention into the parental relationship due to alleged defalcations of the parent. It is also the state at this phase of the case which "marshals an array of public resources to prove its case and disprove the parents' case." *Santosky v. Kramer, supra,* —— U.S. at

——, 102 S.Ct. at 1397, 71 L.Ed.2d at 610. If the state is successful and obtains a dependency adjudication, it is then permitted to seek a termination decree at the dispositional phase of the case. Section 19–11–105, C.R.S.1973 (1978 Repl. Vol. 8 and 1981 Supp.). Only the heightened standard of clear and convincing evidence at the dependency phase of the case will adequately protect the liberty interest of both the parent and child in their continued relationship.

What must not be forgotten is that Colorado's statutory standards of dependency and neglect are imprecise. A dependent or neglected child includes the following: a child who lacks proper parental care through the actions or omissions of his parent; a child whose environment is injurious to his welfare; a child whose parent fails to provide proper or necessary subsistence; a child who is without proper care through no fault of the parent; and a child who is otherwise beyond the control of his parent. Section 19–1–103(20), C.R.S.1973 (1978 Repl. Vol. 8 and 1981 Supp.). These standards often invite determinations based upon the subjective values of the factfinder. Compounding the subjective character of the dependency standards is the unfortunate fact, as *Santosky* noted, that dependency proceedings often involve the "poor, uneducated, or members of minority groups" who may be "vulnerable to judgments based on cultural or class bias." —— U.S. at ——, 102 S.Ct. at 1399, 71 L.Ed.2d at 612–13. These factors, coupled with the preponderance of evidence standard itself, create a significant risk of an erroneous adjudication of the very fact which is a *sine qua non* of the state's right to intervene in the family unit in the first place.

I do not share the majority's concern that a clear and convincing standard of proof will cause the state to become so enmeshed in the adversary process as to destroy its capacity to function effectively as a "helping intervenor" in the post-adjudication resolution of family problems. I believe the state and its agents are quite capable of maintaining a balance consistent with its

*parens patriae* role throughout the adjudicatory phase of dependency proceedings regardless of the standard of proof applicable to the issue of dependency. Moreover, whether we like it or not, the Colorado statutory procedures for a dependency adjudication are such that, once the state decides to intrude into the privacy of the family relationship by seeking a dependency adjudication, it must assume an adversary position *vis-a-vis* the natural parent. No matter what standard of proof it might operate under, the state will be obligated to marshal its evidence and to present formal proof of inadequate parental ability if it expects to obtain an adjudication permitting it to interpose itself between the parent and the child as *parens patriae.* More important, whatever polarization the clear and convincing standard might bring about is more than offset by the procedural protections which this same standard will bestow on the natural parent when those protections are needed most. For unless and until the state proves dependency, both the child and the parent share a vital interest in preventing an erroneous adjudication that may lead directly to the termination of their natural relationship. I cannot believe that the state's interest in preserving and strengthening family ties would be so impaired were it required to prove the allegations of a dependency adjudication by the same standard of factual certainty applicable to the commitment of an alcoholic for treatment, section 25–1–311(4), C.R.S.1973 (1981 Supp.), or to the certification of short term treatment of the mentally ill, section 27–10–111(1), C.R.S.1973 (1981 Supp.).

## II.

Because Colorado's statutory scheme permits intermediate degrees of governmental intrusion into the parent-child relationship once a dependency adjudication is entered, it might be argued that the clear and convincing standard should apply to all dependency proceedings. I would apply this standard, however, only to those dependency adjudications which serve as a predicate for a termination proceeding. It is only in these cases that the parent's basic liberty interest in the continuation of the parental relationship is threatened. If the prior dependency adjudication has been entered under the preponderance of evidence standard, I believe the state should be permitted to seek some form of intermediate disposition short of termination without the need to relitigate the dependency issue under the elevated clear and convincing standard of proof. Where however the state initiates a termination proceeding based upon a prior adjudication entered under the preponderance of evidence standard, due process of law in my opinion requires the state to establish the dispositive fact of dependency by clear and convincing evidence, as well as all other statutory elements essential to termination. Although admittedly there is judicial inconvenience in such a procedure, this inconvenience is more than justified because the state is seeking to terminate a natural relationship which finds its source in the fundamental character of the human condition.

Since the adjudication of dependency in this case is what led directly to the termination proceeding, and without which the termination decree would not have been entered, I consider the condition of *prior* dependency a dispositive fact which, under *Santosky*, must be established by the clear and convincing standard of proof. I would therefore require the trial court upon remand to rehear the allegations of dependency or neglect as part of the termination proceedings. A termination decree should be entered only if the prior condition of dependency or neglect has been established by clear and convincing evidence and all the other statutory criteria for termination in section 19–11–105 also have been established under this elevated standard of proof.