654 P.2d 312 (1982)
The PEOPLE of the State of Colorado and the Boulder County Department of Social Services, Petitioners-Appellees, In the Interest of O.E.P., Appellee, And Concerning, J.L.P. and P.N.H., Respondents, and
C.P., Respondent-Appellant.
No. 82SA222.
Supreme Court of Colorado, En Banc.
November 8, 1982.
Rehearing Denied December 6, 1982.
James M. Downey, Asst. County Atty., Boulder, for petitioners-appellees.
Dale E. Johnson, Boulder, Guardian ad Litem for O.E.P.
*313 Richard D. Irvin, Boulder, for respondent-appellant, C.P.
QUINN, Justice.
Appellant, C.P., appeals from an adjudication that her four year old daughter, O.E.P., is a dependent or neglected child. C.P. claims that section 19-3-106(1), C.R.S. 1973 (1981 Supp.), which requires the state to prove dependency or neglect by a preponderance of evidence at the adjudicatory hearing, violates due process of law.[1] She also contends that reversible error occurred when the trial court admitted hearsay statements made by O.E.P. to third persons. Finally, she asserts that the dependency adjudication was based upon insufficient evidence. We find no error and affirm the judgment.

I.
In October 1978 O.E.P., who was then two years old, was living with C.P., her 28 year old natural mother, in San Francisco, California. O.E.P. was born during C.P.'s marriage to Dr. P.,[2] although Dr. P. denied paternity of the child. C.P. left Dr. P. in 1977 and moved to San Francisco. After arriving there C.P. moved in with P.H., a man whom she previously had met on a train trip from New York to California.[3] Because C.P. had difficulty locating housing which accepted children, she frequently placed O.E.P. in a San Francisco foster home for abused children run by Maria Eitz.
Ms. Eitz urged C.P. to consider voluntarily relinquishing custody of her daughter until her living conditions stabilized. C.P. agreed to the suggestion. Ms. Eitz contacted a responsible acquaintance, whom we refer to as Ms. Doe. Ms. Doe resided in Longmont, Colorado, and agreed to temporarily care for O.E.P. On October 19, 1978, C.P. delivered her daughter to Ms. Doe's custody.
O.E.P. has been living with the Doe family, with one brief interruption, since October 1978. After relinquishing custody to Ms. Doe, C.P. maintained only minimal contact with her daughter and, until the dependency petition was filed, had not sent any money to Ms. Doe for the child's support. During this period C.P. has visited with O.E.P. only three times. On November 30, 1978, C.P. visited the child at the Doe home and stayed approximately two hours. In June 1979, after learning that the Doe family planned to take the child to Hawaii for a vacation, C.P. took the child to San Francisco for approximately two weeks because of C.P.'s fear of airplanes. During this two week period C.P. left O.E.P. with Maria Eitz, who informed Ms. Doe that the child should be taken back to Colorado. Pursuant to the advice of Ms. Eitz, C.P. again relinquished custody to Ms. Doe. The third visit between C.P. and O.E.P. was in late December 1979. On this occasion C.P. and her boy friend, P.H., spent two days and two nights visiting at the Doe cabin in Estes Park, Colorado. The facts surrounding this visit must be developed more fully, as it precipitated the filing of the dependency and neglect petition.
In December 1979 C.P. contacted Ms. Doe shortly after Christmas and said that she and her boyfriend, P.H., wanted to visit O.E.P. Ms. Doe invited C.P. and P.H. to spend December 29 and 30 with the Doe family at their Estes Park cabin. On December 30, the second day of C.P.'s visit, Ms. Doe decided to return to Longmont with other members of her family and invited C.P. and P.H. to spend an additional night with O.E.P. at the cabin.
On December 31 C.P. and P.H. brought O.E.P. to the Doe home in Longmont at *314 approximately 1:00 p.m. Ms. Doe fed the child and then put her to bed for a nap. C.P. and P.H. then left for California. O.E.P. awoke at approximately 5:00 p.m., and Ms. Doe decided to give the child a bath. While she was undressing the child, Ms. Doe noticed that she had a bright red inflammation around her vagina. Ms. Doe also sensed a strong odor which she described as similar to the odor present "after two people had intercourse." She summoned a female friend, who also observed the inflammation and detected the odor. The child's condition, according to both women, was definitely not caused by diaper rash.
After bathing the child Ms. Doe questioned her about the source of the odor and inflammation. From this conversation Ms. Doe reckoned that the child might have been exposed to some form of sexual abuse. After the child had been fed, Ms. Doe noticed that she cried hysterically for approximately one hour. Ms. Doe called Maria Eitz in California, who advised her to take O.E.P. to a doctor. The child was taken to a hospital for an examination, which disclosed a reddened vulva along with internal stretching and superficial tears to that part of the body. The police were called and eventually the Boulder County Sexual Abuse Team was contacted. Michelle Tipple, a social worker for the Sexual Abuse Team, conducted an investigation which included an interview with the child on January 2, 1980.
The Boulder County Department of Social Services (department) filed a petition for adjudication of dependency or neglect on February 8, 1980. The petition alleged, inter alia, that the dependency or neglect resulted from the child having been subjected to mistreatment or abuse, section 19-1-103(20)(a), C.R.S.1973 (1978 Repl.Vol. 8), that the child lacked proper parental care through the actions or omissions of the parent, section 19-1-103(20)(b), C.R.S.1973 (1978 Repl.Vol. 8), and that the child's environment was injurious to her welfare, section 19-1-103(20)(c), C.R.S.1973 (1978 Repl. Vol. 8). Pending an adjudicatory hearing the court placed temporary custody of the child in the department, which in turn continued the foster care administered by Ms. Doe. The court also ordered pyschiatric and psychological evaluations of the child and C.P.
Prior to the adjudicatory hearing C.P. moved for an order requiring the department to establish dependency or neglect by proof beyond a reasonable doubt or, in the alternative, by clear and convincing evidence. The court denied the motion. During the adjudicatory hearing the department presented various witnesses, including Ms. Doe and the social worker, Michelle Tipple. The court permitted Ms. Doe to testify, over C.P.'s hearsay objection, to her conversation with O.E.P. following the child's return from the cabin in Estes Park and her bath on December 31. Ms. Doe testified as follows:
"I asked her where she slept and she said she slept with C. [her mother] and P. [the mother's boyfriend] in my bed and she said they played games and I asked her what kind of games and she said that P. kissed her and I asked her where. She pointed, I think, to her tummy, and I asked her what C. did and she said that C. was kissing her and tickling her on the tummy and she said that P. had a nose between his legs and I asked her if she kissed them, P. and C., and she said `yes', and just, you knowI just asked her questions to kind of lead so she could tell me what she had experienced at that time and that's when I became aware of what I felt the possibility was that the child had been exposed to things I didn't think a child that age should be exposed to."
The court also permitted, over C.P.'s objection, the following testimony from Ms. Tipple about O.E.P.'s reactions when she saw pictures in a family album Ms. Doe brought for Ms. Tipple's interview with the child on January 2:
"In the interview, the child was showing me pictures of various family members, including C. [her mother] and P.H. [the mother's boyfriend] and [Dr.] P. She was able to identify very clearly who these *315 people were. In talking with her, I asked if she had recently visited with C. and with P. and those were the terms and names she used for these people. She indicated, yes, she had. I asked her what happened at that time and she indicated to methis was a quote `C. and P. hurt me down there,' pointing down between her legs. She then went on to indicate that she did not like it that way and that it hurt her and she cried and cried and that basically was the end of the interview."
Also testifying at the adjudicatory hearing were psychiatric and psychological witnesses who had examined C.P. According to these witnesses, C.P. suffered from mental and emotional disorders which rendered her seriously deficient in basic parental ability. A psychotherapist who had evaluated both C.P. and O.E.P. testified that the mother lacked the capacity to form a meaningful parental relationship with her daughter and the child, in turn, suffered from emotional deprivation.
At the conclusion of the hearing the court found that O.E.P. had been subjected to mistreatment or abuse, that she lacked proper parental care and guidance, and that the child's parental environment was injurious to her welfare. The court thereupon adjudicated O.E.P. a dependent and neglected child.[4]
At a dispositional hearing held in November 1980 the court, pursuant to the department's request, entered an order continuing the legal custody of O.E.P. in the department with authority to place the child in the foster care of Ms. Doe. The court also ordered C.P. to comply with a treatment plan which included psychiatric counseling and a program of supervised visitation with O.E.P. This appeal followed.

II.
C.P. argues that section 19-3-106(1), C.R.S.1973 (1981 Supp.), which authorizes the preponderance of evidence standard at an adjudicatory hearing concerning an allegation of dependency or neglect, violates the Due Process Clause of the United States and Colorado Constitutions. U.S. Const.Amend. XIV; Colo. Const. Art. II, Sec. 25. In C.P.'s view, the preponderance standard is inadequate to the task of protecting the substantial liberty interest of the natural parent against governmental intrusion into the integrity of the family unit. We disagree with C.P.'s argument.
In Santosky v. Kramer, ___ U.S. ___, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982), the United States Supreme Court considered whether a state may terminate the parent-child relationship upon proof of the alleged grounds for termination under a preponderance of evidence standard only. Recognizing that the nature of due process in a termination proceeding turns on a balancing of three distinct factors, the court went on to consider the private interest affected by the termination proceeding, the risk of *316 error created by the preponderance of evidence standard, and the countervailing governmental interest supporting the challenged procedure. This balancing process led the court to conclude that "use of a `fair preponderance of the evidence' standard in such proceedings is inconsistent with due process," ___ U.S. at ___, 102 S.Ct. at 1397, 71 L.Ed. at 609, and that the clear and convincing standard of proof "adequately conveys to the factfinder the level of subjective certainty about his factual conclusions necessary to satisfy due process." ___ U.S. at ___, 102 S.Ct. at 1402, 71 L.Ed.2d at 617. In People in the Interest of A.M.D., 648 P.2d 625 (Colo.1982), this court considered whether a dependency adjudication determined under the preponderance of evidence standard may support an application for termination of parental rights under section 19-11-105, C.R.S.1973 (1978 Repl.Vol. 8 and 1981 Supp.). In approving the use of such an adjudication as a predicate for a termination proceeding, the court employed the three-factor balancing test basic to due process analysis, e.g., Mathews v. Eldridge, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976), and stated:
"The product of this three-factor balancing process as applied to Colorado statutes is that the private interest affected will receive full protection, the risk of error in fact finding will not be appreciably increased, and the substantial governmental interest in providing assistance and treatment to help families with dependent or neglected children address the causes of the dependency or neglect will be promoted if the original dependency or neglect determination is made by a preponderance of the evidence. This balancing test demonstrates that the application of the preponderance of the evidence standard for all purposes in the underlying dependency or neglect determination comports with due process of law. We do not read Santosky to mandate a higher standard under these circumstances.
"We hold that due process of law is accorded to the parties to a termination of parental rights proceeding under Colorado law when the [statutory] grounds for termination ... are established by clear and convincing evidence and the underlying dependency or neglect determination is established by a preponderance of the evidence." 648 P.2d at 640-41.
A corollary of our holding in A.M.D. is that the adjudicatory phase of a dependency proceeding does not affect the natural parent's liberty interest in the parent-child relationship to the same constitutionally significant degree as does a termination proceeding. A dependency adjudication, by itself, will not support a termination decree. The court may terminate parental rights only if, following a dependency adjudication, a separate hearing is conducted at which the following elements are proven by clear and convincing evidence: the entry of the prior dependency adjudication; the parent's lack of reasonable compliance with an appropriate treatment plan or the lack of success with the treatment plan; parental unfitness; and the unlikely prospect of any change of conduct or condition on the part of the parent. Section 19-11-105(1), C.R.S. 1973 (1978 Repl.Vol. 8).[5]
*317 The primary purpose of a dependency adjudication, as noted in A.M.D., is to furnish the "jurisdictional bases for State intervention to assist the parents and child in establishing a relationship and home environment that will preserve the family unit." 648 P.2d at 640. Viewed in the light of this essentially remedial purpose of preserving rather than destroying the parental relationship, "the importance of permitting State intervention on a standard of proof lower than clear and convincing evidence becomes evident." People in the Interest of A.M.D., 648 P.2d at 640. We therefore reject C.P.'s contention that section 19-3-106(1), C.R.S.1973 (1981 Supp.), which permits a dependency adjudication under the preponderance of evidence standard, violates due process of law under the United States and the Colorado Constitutions.

III.
We turn to C.P.'s challenge to the admission of testimony of Ms. Doe and the social worker, Ms. Tipple, recounting O.E. P.'s assertion to them about the incident on December 31 at the Estes Park cabin. C.P. argues that these statements were clearly hearsay and do not fall within any recognized hearsay exception. We disagree with C.P.'s argument.
Hearsay is a "statement other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." C.R.E. 801(c). Because O.E.P.'s assertions were offered to prove the truth of the matter asserted thereinthat is, an act of mistreatment or abusethey clearly fit within the definition of hearsay. Rule 802 provides, in pertinent part, that hearsay is not admissible except as expressly authorized by the Colorado Rules of Evidence. We therefore must look to these rules in resolving the admissibility of the challenged hearsay.[6]
C.R.E. 803(2) defines the excited utterance exception to the hearsay rule of exclusion as follows: "A statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." The rationale behind this exception is founded on the general reliability attaching to statements made under the stress of excitement. VI J. Wigmore, Evidence § 1747 (Chadmore rev. ed. 1976); C. McCormick, Handbook of the Law of Evidence § 297 (2d ed. E. Cleary 1972). The exception is an obvious recognition of the fact that "circumstances may produce a condition of excitement which temporarily stills the capacity of reflection and produces utterances free of conscious fabrication." Fed.R.Evid. 802(2) Advisory Committee Note. In this respect the rationale for the excited utterance exception is similar to the justification underlying the res gestae exception which, under common law principles, applied to "statements relating to a startling act or event made spontaneously and without reflection while the declarant was under the stress of excitement." Lancaster v. People, Colo., 615 P.2d 720, 721 (1980). Although in most instances the "startling event" will be the act or transaction upon which the legal controversy is predicated, such as an assault or accident, the excited utterance exception is not restricted only to statements arising directly *318 out of such events. Rather, courts will look primarily to the effect of a particular event upon the declarant and, "if satisfied that the event was such as to cause adequate excitement, the inquiry is ended." C. McCormick, supra, at § 297.
C.P. focuses on two factors to support her argument for exclusion of the challenged hearsay. She points first to the lapse of time between the act of abuse and the assertions, and next to the questioning which immediately preceded the child's statements. Neither factor, however, nullifies the admissibility of this evidence under the excited utterance exception.
Although the temporal interval between the "startling event" and the child's statement is not without significance, it is not conclusive on the question of admissibility. The element of trustworthiness underscoring the excited utterance exception, particularly in the case of young children, finds its source primarily in "the lack of capacity to fabricate rather than the lack of time to fabricate." Fed.R.Evid. 803(2) Advisory Committee Note. See, e.g., People v. Roark, 643 P.2d 756 (Colo.1982) (statement by five year old eyewitness made twelve hours following a beating admissible); State v. Noble, 342 So.2d 170 (La.1977) (statement by four year old victim admissible when made two days after incident); People v. Lovett, 85 Mich.App. 534, 272 N.W.2d 126 (1976) (statement of three year old eyewitness made one week after event admissible where child had been out of town during intervening period); Love v. State, 64 Wis.2d 432, 219 N.W.2d 294 (1974) (statement by three year old victim made on day following event admissible).
Nor does the fact that some general questioning preceded the hearsay declarations destroy their character as excited utterances. An inquiry, especially one addressed to a child of tender years, is not sufficient in itself to undo the underlying basis in reliability for the excited utterance exception. See, e.g., United States v. Iron Shell, 633 F.2d 77 (8th Cir.1980), cert. denied, 450 U.S. 1001, 101 S.Ct. 1709, 68 L.Ed.2d 203 (1981) (statement by nine year old victim in response to police questioning admissible); United States v. Nick, 604 F.2d 1199 (9th Cir.1979) (statement by three year old victim in response to mother's question admissible); State v. Noble, supra (statement by four year old victim in response to interrogation by grandmother admissible); People v. Woodward, 21 Mich.App. 549, 175 N.W.2d 842 (1970) (statement by eight year old victim in response to police interrogation admissible); Haley v. State, 157 Tex.Cr. 150, 247 S.W.2d 400 (1952) (statement made by four year old victim in response to questioning by mother and neighbors admissible); State v. Bloomstrom, 12 Wash.App. 416, 529 P.2d 1124 (1974) (statement by eight year old victim admissible when made in response to mother's questioning).
An examination of the circumstances underlying O.E.P.'s statements to Ms. Doe and Ms. Tipple satisfies us that both assertions qualified as excited utterances. O.E.P. made her statement to Ms. Doe at what was virtually her first opportunity to discuss the events of the preceding evening with someone other than C.P. and P.H., both of whom had left the Doe home only shortly before the statement was made. The prolonged crying which occurred after the statement demonstrates that the stressful effects of the mistreatment were still present and quite capable of surfacing on their own power. Also, the words employed by O.E.P. in describing her experience to Ms. Doe were most appropriate for a three year old and, thus, not without some indication of trustworthiness. See United States v. Nick, supra; State v. Bloomstrom, supra. A child of three years is hardly adept at the type of reasoned reflection necessary to concoct a false story relating to a bizarre sexual experience implicating the child's mother. See Lancaster v. People, supra.
O.E.P.'s statement to Ms. Tipple also was properly admitted. This statement was made in response to a general inquiry about the child's recent visit with C.P. and P.H. The terminology describing the abuse was that of O.E.P., not Ms. Tipple, and, like the previous statement, the child's declaration to Ms. Tipple was followed by noticeable *319 crying. Moreover, although the statement was made several days after the act of abuse, the observation by O.E.P. of photographs depicting persons who subjected her to the mistreatment is the type of event which would engender substantial excitement in the child and, in this respect, constitutes an independent predicate for admitting the statement as an excited utterance. See United States v. Napier, 518 F.2d 316 (9th Cir.1975), cert. denied, 423 U.S. 895, 96 S.Ct. 196, 46 L.Ed.2d 128 (1975) (statement by assault victim eight weeks after assault admissible when in response to exhibition of assailant's photograph, which itself was a startling event).
Because the source of stress undoubtedly depends upon many variables, not the least of which are the age and emotional endowment of the declarant, the trial court is in a preferred position to determine whether a particular event causes sufficient excitement in the declarant to render a statement admissible as an excited utterance. Considering the totality of circumstances underlying the hearsay assertions of O.E.P., we are satisfied that the trial court did not err in admitting the child's statements as excited utterances under C.R.E. 803(2).

IV.
C.P.'s final argument is that there was insufficient evidence to support the dependency or neglect adjudication. We disagree.
An adjudicatory hearing on dependency or neglect is designed to determine whether the child, for whatever reason, lacks the benefit of adequate parental protection, care and guidance. E.g., People in the Interest of E.A., 638 P.2d 278 (Colo. 1982); People in the Interest of S.S.T., 38 Colo.App. 110, 553 P.2d 82 (1976). The department's evidence established a physical and psychological injury to the child under circumstances which, to say the least, permitted the court to reasonably conclude that C.P. had "subjected the child to mistreatment or abuse" within the meaning of section 19-1-103(20)(a), C.R.S.1973 (1978 Repl.Vol. 8). In addition, there was evidence that C.P. was an inadequate parent who considered her child as an encumbrance upon her free-wheeling way of life. After having relinquished custody to Ms. Doe in 1978, C.P. contributed no money for child support, expressed only minimal concern for O.E.P.'s welfare, and offered practically no care or guidance to the child. This state of affairs, independently of the act of abuse on December 30, 1979, was adequate to support the determination that O.E.P. lacked "proper parental care through the actions or omissions of the parent." Section 19-1-103(20)(b), C.R.S.1973 (1978 Repl.Vol. 8). Finally, there can be no question that C.P.'s life style and mental disability, particularly during the two year period preceding the dependency hearing, created an environment which was injurious to her daughter's welfare. Section 19-1-103(20)(c), C.R.S.1973 (1978 Repl.Vol. 8). In short, the record provides adequate support for the adjudication.
The judgment is affirmed.
NOTES
[1] This appeal was referred to this court because of C.P.'s constitutional challenge to section 19-3-106(1), C.R.S.1973 (1981 Supp.). See sections 13-4-102(1)(b) and 13-4-110, C.R. S.1973.
[2] C.P. married Dr. P. in 1976, after a Wisconsin divorce from her first husband.
[3] During her relationship with P.H., C.P. gave birth to a son. However, C.P. and Dr. P. never divorced. In fact, during the hearing in this case, both C.P. and P.H. were living in the same house with Dr. P.
[4] Section 19-1-103(20), C.R.S.1973 (1978 Repl. Vol. 8), states, in pertinent part:

"`Neglected or dependent child' or `dependent or neglected child' means a child:
(a) Whose parent, guardian, or legal custodian has abandoned him or has subjected him to mistreatment or abuse or whose parent, guardian, or legal custodian has suffered or allowed another to mistreat or abuse the child without taking lawful means to stop such mistreatment or abuse and prevent it from recurring;
(b) Who lacks proper parental care through the actions or omissions of the parent, guardian, or legal custodian;
(c) Whose environment is injurious to his welfare;
(d) Whose parent, guardian, or legal custodian fails or refuses to provide proper or necessary subsistence, education, medical care, or any other care necessary for his health, guidance, or well-being."
The court also found that C.P., as alleged in the petition, had abandoned O.E.P., section 19-1-103(20)(a), C.R.S.1973 (1978 Repl.Vol. 8), and that she failed to provide subsistence, education or medical care necessary to the child's health or well-being, section 19-1-103(20)(d), C.R.S.1973 (1978 Repl.Vol. 8). Because we find the evidence adequate to support the dependency adjudication on the other grounds alleged in the petition, we do not address the sufficiency of the evidence with respect to abandonment and C.P.'s failure to provide necessary subsistence for the child's health or well-being.
[5] Section 19-11-105(2), C.R.S.1973 (1978 Repl. Vol. 8), states:

"In determining unfitness, conduct, or condition, the court shall find that continuation of the legal relationship between parent and child is likely to result in grave risk of death or serious injury to the child or that the conduct or condition of the parent or parents renders the parent or parents unable or unwilling to give the child reasonable parental care. In making such determinations, the court shall consider, but not be limited to, the following:
(a) Emotional illness, mental illness, or mental deficiency of the parent of such duration or nature as to render the parent unlikely within a reasonable time to care for the ongoing physical, mental, and emotional needs of the child;
(b) Conduct towards the child of a physically or sexually abusive nature;
(c) History of violent behavior;
(d) A single incident of life-threatening or gravely disabling injury or disfigurement of the child;
(e) Excessive use of intoxicating liquors or controlled substances, as defined in section 12-22-303(7), C.R.S.1973, which affect the ability to care and provide for the child [1981 Supp.];
(f) Neglect of the child;
(g) Long-term confinement of the parent;
(h) Injury or death of a sibling due to proven parental abuse or neglect;
(i) Reasonable efforts by child-caring agencies which have been unable to rehabilitate the parent or parents."
Before the court may rely upon any factor in section 19-11-105(2)(a)-(i) to support a termination decree, such factor must be established by clear and convincing evidence. People in the Interest of A.M.D., 648 P.2d 625, 638-39, n. 13 (Colo.1982).
[6] The full text of C.R.E. 802 is that "[h]earsay is not admissible except as provided by these rules or by the civil and criminal rules applicable to the courts of Colorado or by any statutes of the State of Colorado." Since the hearsay evidence in issue was not admitted pursuant to a rule of procedure or statute, the only consideration we address is whether the evidence was admissible under the Colorado Rules of Evidence.