The PEOPLE of the State of Colorado, Plaintiff-Appellee,

v.

James Everett FRANKLIN, Defendant-Appellant.

No. 81SA523.

Supreme Court of Colorado, En Banc.

June 4, 1984.

**776**

J.D. MacFarlane, Atty. Gen., Dale Tooley, Dist. Atty., O. Otto Moore, Asst. Dist. Atty., Brooke Wunnicke, Chief Appellate Deputy Dist. Atty., Donna Skinner Reed, Deputy Dist. Atty., Denver, for plaintiff-appellee.

Marks & Olom, Jonathan L. Olom, Denver, for defendant-appellant.

KIRSHBAUM, Justice.

Defendant, James Everett Franklin, appeals his jury convictions of manslaughter and criminal abortion, in violation of sections 18–3–104(1)(a) and 18–6–102, 8 C.R.S. (1978). He asserts that the Colorado criminal abortion statute is void or, alternatively, that the criminal abortion statute is unconstitutionally vague, and that the trial court erred in admitting certain evidence over defendant's objections.[1] We affirm.

## I. FACTS

Defendant, a doctor of osteopathy licensed in the State of Colorado, was the sole proprietor of the Abortion Clinic of Denver located at 1750 Humboldt Street on February 22, 1980. On that date, at approximately 9:00 a.m., Mary Zellers drove her sister, Betty Damato, to the clinic. Damato previously had arranged to have an abortion performed at that time.

Later that afternoon, Zellers called the clinic and spoke with Damato, who told Zellers that problems had developed during the surgery. Zellers drove to the clinic to pick up her sister, and observed that Damato appeared pale and was holding her stomach. Damato, in a very soft voice, related

---

1. Because defendant challenges the constitutionality of the criminal abortion statute, this court has jurisdiction of this appeal. § 13–4–102(1)(b), 6 C.R.S. (1973).

additional information about the procedure to Zellers at the clinic. They then drove to Damato's apartment, and during this ride Damato again referred to the surgery performed at the clinic. In helping her sister from the car, Zellers noticed a blood stain where Damato had been seated. Damato spent the night at Zellers' home, but returned to her own apartment the following day.

Two days later, on the morning of February 25, 1980, Damato was taken by ambulance to the emergency room of Porter Memorial Hospital. She was unconscious, with no pulse or respiration, and was pronounced dead a short time after her arrival. Dr. Robert Lyle Deters, a forensic pathologist, determined from an autopsy that her death was caused by "a massive overwhelming bacterial infection" originating in the uterus, the source of which was a partially truncated and macerated fetus.

Defendant was indicted by a grand jury on one count of manslaughter and one count of criminal abortion. At trial, the prosecution introduced a transcript of defendant's testimony at the grand jury proceedings containing his statement that he did not perform a therapeutic abortion on Damato on February 22, 1980. Over defendant's objection, the prosecution also introduced into evidence certain of the statements Damato had made to her sister on February 22, 1980, and a photograph of the decedent depicting the partial extrusion of a truncated and macerated fetus from her vagina. Defendant was convicted on both counts.

## II. THE CRIMINAL ABORTION STATUTE

■ Defendant argues that as a result of this court's decision in *People v. Norton*, 181 Colo. 47, 507 P.2d 862 (1973), Colorado's criminal abortion statute no longer retains sufficient substance to permit enforcement of the legislative intent. We disagree.

Prior to *Norton*, the Colorado criminal abortion statute, 1971 Perm.Supp., C.R.S. 1963, 40–6–101 to –105, provided one procedure for the legal termination of pregnancies. Any woman who desired to obtain an abortion was required to petition a special hospital board for a determination of whether the woman was entitled to an abortion pursuant to specified statutory grounds. If the board unanimously approved the petition, the woman was entitled to have an abortion performed in an accredited hospital by a licensed physician using accepted medical procedures. *See Doe v. Dunbar*, 320 F.Supp. 1297 (D.Colo.1970).

In *Roe v. Wade*, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973), and *Doe v. Bolton*, 410 U.S. 179, 93 S.Ct. 739, 35 L.Ed.2d 201 (1973), the United States Supreme Court held that a state has an important and legitimate interest in protecting both the health of the woman and the potential life of the fetus, yet neither interest is "compelling" throughout the entire pregnancy. Therefore, the Court concluded, that state legislation may not interfere with a woman's decision to terminate her pregnancy during the first trimester of pregnancy, and such legislation regulating abortions during the second trimester must reasonably relate to the preservation and protection of the woman's health.

In *Norton*, the constitutionality of Colorado's criminal abortion statute was challenged on the basis of those two federal decisions. We reasoned that they required the conclusion that certain portions of Colorado's statute violated the Fourteenth Amendment to the United States Constitution.[2] However, other provisions of the statute were not declared unconstitutional. Those pertinent portions of the statute which were not declared unconstitutional are presently codified at sections 18–6–101

2. Those statutory provisions of the criminal abortion statute expressly ruled unconstitutional by this court in *People v. Norton*, 181 Colo. 47, 507 P.2d 862 (1973), concerned the requirement that an abortion be performed in a "licensed hospital" and that the abortion be certified by all members of a "special hospital board" consisting of three licensed physicians.

to –105, 8 C.R.S. (1978). Section 18–6–102(1) provides:

> Any person who intentionally ends or causes to be ended the pregnancy of a woman by any means other than justified medical termination or birth commits criminal abortion.[3]

Section 18–6–101(1) defines "justified medical termination" as the

> intentional ending of the pregnancy of a woman at the request of said woman or, if said woman is under the age of eighteen years, then at the request of the woman and her then living parent or guardian, or, if the woman is married and living with her husband, at the request of said woman and her husband, by a licensed physician *using accepted medical procedures*. (emphasis added)[4]

The General Assembly has addressed the question of the validity of remaining provisions of a statute declared to be unconstitutional in part in section 2–4–204, 1B C.R.S. (1980), as follows:

> If any provision of a statute is found by a court of competent jurisdiction to be unconstitutional, the remaining provisions of the statute are valid, unless it appears to the court that the valid provisions of the statute are so essentially and inseparably connected with, and so dependent upon, the void provision that it cannot be presumed the legislature would have enacted the valid provisions

without the void one; or unless the court determines that the valid provisions, standing alone, are incomplete and are incapable of being executed in accordance with the legislative intent.

The question posed by defendant is whether the remaining portions of the statute are so independent from the provisions found unconstitutional in *Norton* that the statute as presently constituted can be said to be a valid expression of legislative intent which motivated the initial statute. To address this issue, we must first examine that legislative intent.

In *Palmer v. People*, 162 Colo. 92, 98, 424 P.2d 766, 769 (1967), we stated that the purpose of Colorado's then effective criminal abortion statute, C.R.S.1953, 40–2–23, was "to prevent abortions other than for lawful purposes or by natural causes." That statute was subsequently amended, effective April 25, 1967, by the statute found partially unconstitutional in *Norton*.[5] The 1967 amendments also express the desire of the General Assembly to prevent abortions other than for lawful purposes. However, the 1967 amendments also considerably broadened the circumstances under which an abortion would be considered lawful. By defining these circumstances as "justified medical terminations," the General Assembly specifically required that any abortion procedures be performed by "a licensed physician using accepted medical procedures."[6] This provision evi-

---

3. Except as permitted by statute, persons performing an abortion are guilty of a class four felony unless the woman dies, in which event the offense is defined as a class two felony. § 18–6–102(2), 8 C.R.S. (1978).

4. Although the present language requiring parental consent was held unconstitutional in *Foe v. Vanderhoof*, 389 F.Supp. 947 (D.Colo.1975), and language in Missouri's statute similar to Colorado's requiring spousal consent was held unconstitutional in *Planned Parenthood v. Danforth*, 428 U.S. 52, 96 S.Ct. 2831, 49 L.Ed.2d 788 (1976), such decisions are not dispositive of the issue addressed in the case at bar.

5. Ch. 190, § 6, 1967 Colo.Sess.Laws 284, 285.

6. The 1967 act amending the criminal abortion statute initially was patterned after model penal code abortion provisions proposed by the Amer-

ican Law Institute in 1959. Note, *Colorado's New Abortion Law*, 40 U.Colo.L.Rev. 297, 299 (1968). Neither prior Colorado statutory law nor the 1959 model penal code proposal, however, contained the requirement that a licensed physician use "accepted medical procedures" in performing an abortion. The drafter of the bill, which with amendments was adopted as the 1967 amendment, indicated that this language was taken from a proposed bill which was described as the model for California's 1967 Therapeutic Abortion Act. *Id.* at 302 n. 46. An inspection of both the proposed bill and the legislation adopted by California reveals no such language in even the remotest sense. *See* Leavy & Charles, *California's New Therapeutic Abortion Act: An Analysis and Guide to Medical and Legal Procedure*, 15 U.C.L.A.L.Rev. 1 (1967).

dences a strong intent on the part of the legislature to protect the health of the woman. The statute continues to require medically acceptable procedures to ensure that the woman's health is protected;[7] enforcement of the pertinent remaining sections of the statute will continue to further that intent. *See Covell v. Douglas,* 179 Colo. 443, 501 P.2d 1047 (1972), *cert. denied,* 412 U.S. 952, 93 S.Ct. 3000, 37 L.Ed.2d 1006 (1973). We conclude, therefore, that the remaining portions sufficiently further the General Assembly's intent to protect the health of the woman.

Defendant next contends that the phrase "accepted medical procedures" as used in the criminal abortion statute is inherently vague and uncertain and is not sufficiently definitive to apprise the defendant of the proscribed conduct. We do not agree.

■ Statutes are presumed to be constitutional, and a party asserting the contrary has a heavy burden to establish the alleged unconstitutionality of a penal statute beyond a reasonable doubt. *People v. Caponey,* 647 P.2d 668 (Colo.1982). The concept of fundamental fairness inherent in the due process clause of the Fourteenth Amendment to the federal constitution and in Article II, Section 25 of the Colorado Constitution requires that legislation must be drafted in language sufficiently precise and clear to provide persons of ordinary intelligence with fair notice of what conduct has been determined to be unlawful. *People v. Boyd,* 642 P.2d 1 (Colo.1982); *People v. Beruman,* 638 P.2d 789 (Colo. 1982). Moreover, a penal statute is unconstitutionally vague if it "provides no readily ascertainable standards by which one's conduct may be measured." *Beruman,* 638 P.2d at 793. The terms of Colorado's criminal abortion statute must be analyzed with these perspectives in mind.

■ Under this statute, abortions performed "by means other than justified medical termination or birth" are prohibited. *See Doe v. Dunbar,* 320 F.Supp. 1297 (D.Colo.1970). A "justified medical termination" is now defined as one performed "by a licensed physician using accepted medical procedures." Defendant argues that in *State v. Strance,* 84 N.M. 670, 506 P.2d 1217 (1973), the phrase "acceptable medical procedures" was held unconstitutional, and that the same result should occur here. In *Strance,* however, this phrase was not held to be unconstitutionally vague; rather, the entire portion of the New Mexico statute containing the phrase was held unconstitutional on the basis of the holdings of *Roe v. Wade* and *Doe v. Bolton.* We have reached a contrary result in *People v. Norton,* 181 Colo. 47, 507 P.2d 862 (1973); thus, *Strance* is inapposite.

Defendant's argument that it is constitutionally impermissible to impose criminal sanctions upon a "medical judgment" standard is without merit. In *United States v. Vuitch,* 402 U.S. 62, 91 S.Ct. 1294, 28 L.Ed.2d 601 (1971), the United States Supreme Court was called upon to determine whether the term "health" as used in a District of Columbia criminal abortion statute permitting abortions which were "necessary for the preservation of the mother's health" was unconstitutionally vague under the United States Constitution. The Court concluded that while neither the statute nor the legislative history provided definitional guidance, the term "health" presented no vagueness problems because its interpretation was "a judgment that physicians are obviously called upon to make routinely whenever surgery is considered." *Vuitch,* 402 U.S. at 72, 91 S.Ct. at 1299 (footnote omitted). *See also Doe,* 410 U.S. at 192, 93 S.Ct. at 747 (1973) (phrase which permitted abortions when based upon phy-

---

7. This type of regulation, reasonably related to generally accepted medical standards, justified by important state health objectives and impacting insignificantly on the woman's exercise of her privacy right, has been authorized by the United States Supreme Court. *See Planned Par-*

*enthood Ass'n v. Ashcroft,* —— U.S. ——, 103 S.Ct. 2517, 76 L.Ed.2d 733 (1983); *City of Akron v. Akron Center for Reproductive Health, Inc.,* —— U.S. ——, 103 S.Ct. 2481, 76 L.Ed.2d 687 (1983); *Planned Parenthood v. Danforth,* 428 U.S. 52, 96 S.Ct. 2831, 49 L.Ed.2d 788 (1976).

sicians' "best clinical judgment that an abortion is necessary" not unconstitutionally vague when "the medical judgment may be exercised in light of all factors ... relevant to the well being of the patient").

Whether particular abortion procedures are medically accepted is a question the answer to which any licensed professional must be presumed to know. *See* American College of Obstetricians and Gynecologists, *Standards for Obstetric-Gynecologic Services* 54, 66 (5th ed. 1982). *See generally* National Abortion Federation, *National Abortion Federation Standards* (1981). With the rapid improvement of abortion procedures and techniques, an operation considered unacceptable or dangerous yesterday may be considered "medically acceptable or safe" tomorrow. *See, e.g., City of Akron v. Akron Center for Reproductive Health, Inc.,* —— U.S. ——, 103 S.Ct. 2481, 76 L.Ed.2d 687 (1983) (safety of second trimester abortions has *increased* dramatically through the use of the dilation and evacuation procedure). In such circumstances, any attempt to identify a fixed standard of practice for such procedure might well undermine the legislative intent to protect the health of the woman.

The term "accepted medical procedures" affords the physician "adequate discretion in the exercise of his medical judgment." *Colautti v. Franklin,* 439 U.S. 379, 387, 99 S.Ct. 675, 681, 58 L.Ed.2d 596 (1979). *See also City of Akron v. Akron Center for Reproductive Health, Inc., supra.* It also gives the physician "fair notice that his

contemplated conduct is forbidden by the statute." *United States v. Harriss,* 347 U.S. 612, 617, 74 S.Ct. 808, 812, 98 L.Ed. 989 (1954). Because it is susceptible of proof in any particular case, such standard does not permit the exercise of unbridled discretion by the police, judge and jury. *See People v. Beruman, supra.* We conclude that the standard for measuring the minimal level of physician competence in performing abortions contained in the Colorado criminal abortion statute is not unconstitutionally vague.

## III.  HEARSAY DECLARATIONS

On July 30, 1981, prior to trial, the People presented a motion *in limine* for a pretrial order permitting the introduction into evidence of hearsay statements made by Damato to Zellers under CRE 803(1), (2) and (3). On October 2, 1981, the court granted the motion without specifying under which hearsay exception the statements were found to be admissible. Defendant maintains that the trial court erred in permitting Zellers to testify concerning these hearsay statements.[8] We disagree.

The challenged statements may be classified in three categories: (1) statements made by Damato to Zellers by telephone during the afternoon of February 22, 1980;[9] (2) statements made by Damato to Zellers at the clinic when Zellers arrived in her car;[10] and (3) statements made by Damato to Zellers during the drive home from the clinic.[11] We conclude that the

8.  At trial, defendant again objected to the admission of the statements on the ground of hearsay. The trial court observed that the hearsay issue had been decided before trial, but that defendant could challenge the admissibility of any of Damato's statements to her sister on any other grounds. No other objection was raised, with the exception of an untimely objection that Zellers' testimony about the cost of the medical procedures was not material.

9.  Zellers testified that during this conversation Damato said that "they didn't get it all"; that when Zellers asked, "Why?," Damato said she was bleeding so bad they had to stop; and that when Zellers asked Damato if she was supposed to leave, Damato said yes and further stated that

she would be packed with gauze and given two shots and some pills before she left.

10.  Zellers testified that when she asked her sister if she had received her shots and medicine, Damato stated that she had and that as a result of the operation she could zip her pants up because she had "lost about ten pounds."

11.  Zellers testified that during the twenty-minute ride from the clinic to the apartment, Damato again said that the doctor had informed her that he could not "get it all" and packed her with gauze; that Dr. Franklin had said he would not bill her for the additional $400.00 she owed because she "had been through so much"; and that the doctor used a large spoon-shaped instrument to pull on the lining of her uterus and

trial court did not err in overruling defendant's objection that the statements of Damato were inadmissible as hearsay because they qualify as excited utterance exceptions to the hearsay rule as contemplated by CRE 803(2).

■ Colorado Rule of Evidence 803(2) creates an excited utterance exception to the hearsay rule as follows:

A statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition.

The rule is identical to Federal Rule of Evidence 803(2). In determining the admissibility of statements under this rule, this court has formulated a two-step inquiry: (1) was there "some occurrence or event sufficiently startling to render normal reflective thought processes of an observer inoperative"; and (2) was the statement of the declarant "a spontaneous reaction to the occurrence or event and not the result of reflective thought." *People v. Dement*, 661 P.2d 675, 678–79 (Colo.1983) (quoting *McCormick's Handbook on the Law of Evidence* § 297, at 704 (E. Cleary 2d ed. 1972)).[12] Independent proof of an exciting event is not always necessary; the declaration itself may be sufficient proof of such an event. *See Industrial Commission v. Diveley*, 88 Colo. 190, 294 P. 532 (1930). *See also McCormick's Handbook on the Law of Evidence, supra* at 705; 4 J. Weinstein & M. Berger, *Weinstein's Evidence* ¶ 803(2)[01], at 803–82 (1981).

Here, the content of Damato's statements to Zellers describing the procedures used and the comments made by the doctor on the date in question establish that a stressful event did occur. The surgical procedure itself was unquestionably a significant traumatic event sufficient to strip Damato of the reflective capacity necessary for fabrication. Her vivid description of the circumstances, together with her observable discomfort and profuse bleeding, provide ample basis for the conclusion that the event qualifies under the first step of the inquiry. We conclude that the medical procedure performed on Damato satisfies the first prong of the inquiry required for the application of CRE 803(2).

■ The second prong of the analysis requires a finding that the statements were made spontaneously in reaction to the event and were not the product of reflective thought. This requirement is essential; it is the spontaneity of the statement which provides the circumstantial guarantee of trustworthiness. *People v. Dement, supra; Lancaster v. People*, 200 Colo. 448, 615 P.2d 720 (1980).[13] While the fact that Zellers asked questions of Damato is of some significance, the circumstances sur-

---

placed the cut-up substance removed therefrom in a bag.

**12.** In *People v. Dement*, 661 P.2d 675 (Colo. 1983), the admission of hearsay evidence was challenged as violative of the rights of confrontation guaranteed by the Sixth Amendment of the United States Constitution and Article II, Section 16 of the Colorado Constitution. No such constitutional challenges are presented by this appeal. Similarly, defendant did not raise questions of whether portions of the controverted testimony should have been excluded on grounds of double hearsay or of lack of relevancy. *See, e.g., People v. Schuemann*, 190 Colo. 474, 548 P.2d 911 (1976); CRE 401.

**13.** In *Keefe v. State*, 50 Ariz. 293, 297, 72 P.2d 425, 427 (1937), the rule was explained succinctly:

The true test in spontaneous exclamations is not when the exclamation was made, but whether under all the circumstances of the particular exclamation the speaker may be considered as speaking under the stress of nervous excitement and shock produced by the act in issue, or whether that nervous excitement has died away so that the remark is elicited by the shock of some other act not at issue, which revives the memory of the act in question.

This rationale finds support in the case of *People v. Dement, supra* at 679 (Colo.1983), where we stated the basis for the exception thusly:

"[T]he declarant's powers of reflection and ability to fabricate or misrepresent the events observed are momentarily suspended while the declarant is under the stress of excitement from a startling event."

rounding Damato's statements establish this all important factor in this case.[14]

■ The foundation testimony of Zellers, which established that she observed her sister to be pale, tired, weak, and bleeding, permits the conclusion that Damato was still under great stress when she made the statements at the clinic and in the automobile. Damato's telephoned statement that she was tired and bleeding, made a short time after the medical procedures had terminated, further indicates that she was reporting extremely upsetting facts. The fact that the decedent's statements at the office and in the car were made some time after the operation was performed is but one circumstance among many to be considered in determining whether the two prongs of the test have been satisfied.[15] Neither the fact that the victim's statements were responses to direct questions nor the fact that they did not all describe the shocking event is dispositive of the issue of admissibility. *See People ex rel. O.E.P.*, 654 P.2d 312 (Colo.1982); *People v. Ortega*, 672 P.2d 215 (Colo.App.1983).[16] Accordingly, under the totality of the circumstances presented, we conclude that the trial court did not abuse its discretion in finding all of the statements admissible under CRE 803(2).

## IV. PHOTOGRAPHIC EVIDENCE

■ We turn to the court's ruling admitting a photograph of the deceased illustrating the partial extrusion of a truncated and macerated fetus protruding from the deceased's vagina. Defendant maintains this photograph was horribly gruesome and ir-

relevant and was erroneously admitted over defendant's objection. Again, we cannot agree with defendant's contention.

In *People v. Roark*, 643 P.2d 756, 762 (Colo.1982), this court stated the rule regarding admissibility of photographic evidence:

Ordinarily, photographs are admissible to depict graphically anything a witness may describe in words, provided that the prejudicial effect of the photographs does not far outweigh their probative value. The determination of admissibility is committed to the sound discretion of the trial judge. (citations omitted)

In this case, testimony by the defendant was introduced into evidence in which he denied performing or attempting to perform an abortion on Betty Damato. His testimony also indicated that he refrained from performing a clinical abortion when he noticed the decomposed Achilles' tendon of a dead fetus extruding through Damato's cervix. The prosecution presented the expert testimony of Dr. William Berry Wilson, Jr., who testified that it would be impossible for a dead fetus to reverse itself and come out headfirst. The challenged photograph depicted, albeit very graphically, that the truncated and macerated fetus had been expelled from the vaginal cavity in a headfirst position, as confirmed by the expert testimony of Dr. Robert Lyle Deters.

The trial court determined that the challenged photograph was probative as it was necessary to contradict statements made by defendant. In these circumstances, we cannot conclude that its prejudicial effect

14. In a strikingly similar set of factual circumstances this court admitted spontaneous hearsay statements of the deceased victim of an illegal abortion under the *res gestae* exception in *Solander v. People*, 2 Colo. 48, 63 (1873). Although it does not appear that the court considered the excited state of the declarant, such proof would only enhance the admissibility of the statements under CRE 803(2).

15. "Physical factors such as shock, unconsciousness or pain, may prolong the period in which the risk of fabrication is reduced to an acceptable minimum." 4 J. Weinstein & M. Berger, *Weinstein's Evidence*, ¶ 803(2)[01], at 803–85

(1981). *Cf. People v. Bashara*, 677 P.2d 1376 (Colo.App.1983) (statements of sexually assaulted child were "inherently trustworthy as reactions to a startling and stressful event" despite the fact that the declarant had walked two and one-half blocks before making the hearsay statements).

16. *See* 4 J. Weinstein & M. Berger, *supra* note 15, at 803–88, where the authors note: "If the subject matter of the statement is such as would likely be evoked by the event, the statement should be admitted."

far outweighed its probative value. *See People v. Loscutoff,* 661 P.2d 274 (Colo. 1983). The trial court, therefore, did not abuse its discretion in admitting the challenged photograph.

Accordingly, the determination of the trial court and judgment of conviction are hereby affirmed.