The PEOPLE of the State of Colorado, Petitioner–Appellee,

In the Interest of A.C., a Child,

and

Concerning M.S. and S.S., Intervenors–Appellants.

No. 10CA2536.

Colorado Court of Appeals, Div. VII.

Sept. 15, 2011.

* Sitting by assignment of the Chief Justice under provisions of Colo. Const. art. VI, § 5(3), and

§ 24–51–1105, C.R.S.2010.

Douglas J. Friednash, City Attorney, Laura Grzetic Eibsen, Assistant City Attorney, Denver, Colorado, for Petitioner–Appellee.

Pickard & Associates, P.C., Joe Pickard, Littleton, Colorado, for Intervenors–Appellants.

Opinion by Judge FURMAN.

In this post-termination of parental rights proceeding, M.S. and S.S. (foster parents) appeal from the order changing the placement of A.C., a foster child formerly in their care, to another foster home. We affirm in part and remand for further proceedings.

The juvenile court placed A.C. in foster care days after he was born, and it terminated the parent-child legal relationship between A.C. and his mother less than a year later.

The Denver Department of Human Services (Department) moved A.C. from his first foster home to his second foster home before he turned one year old. The Department had intended the second foster home to be a permanent placement, but it had to remove A.C. unexpectedly. The Department placed A.C. in his third foster home, then a respite home, with appellant foster parents when A.C. was just over one year old. The Department then certified foster parents' home as a "24–hour foster home" for the term of one year.

After A.C. had lived with foster parents for approximately seven months, the Department reported to the juvenile court that A.C. had made "positive progress" in foster parents' home; that the placement was appropriate; that foster parents were meeting A.C.'s needs; and that the Department had no safety concerns at that time. The Department reported that A.C. was "currently placed in an adoptive home." The Department recommended that it retain legal custody of A.C. but that A.C. "remain in his current placement until his adoption is finalized." The court adopted the Department's recommendations.

The next week, the therapist who had provided in-home therapy to A.C. for four months reported her concerns about foster mother. The therapist thought foster mother had "escalated" another foster child's screaming and crying on one occasion, that foster mother had told exaggerated stories about her past and family, and that foster mother had given "inconsistent" medical status information to the Department staff members and practitioners who were involved with A.C.

After the Department received the therapist's report, a Department Certification Review Committee concluded that it needed to remove A.C. from foster parents. The Department did not notify or consult either A.C.'s guardian ad litem (GAL) or the juvenile court before Department staff removed A.C. from foster parents' home one evening.

The GAL filed a motion for a forthwith hearing under section 19–3–203(2), C.R.S. 2011, after foster parents called him the morning after the Department had removed A. C.

At the hearing on the GAL's motion, the juvenile court stated that it was "appalled" by the removal. The court found that the

basis for the removal was "extremely unusual" and that the Department had violated section 19–3–203(2) because it had not kept the GAL informed of any significant developments in the case. The court also granted foster parents' motions to intervene in the subsequent hearings to determine whether A.C. should be returned to them.

The juvenile court later granted the Department's request to have a psychologist evaluate foster mother. At a subsequent hearing, the psychologist testified that her evaluation showed that foster mother had a personality disorder with narcissistic features; was scattered in her thinking; was overly emotional; had unstable moods; and had problems with embellishing information. The psychologist testified that these issues raised concerns about foster mother's mental health, and the psychologist recommended against returning A.C. to foster parents.

After the hearing, the juvenile court determined that A.C. should not be returned to foster parents. The court ruled:

> The bottom line for the Court to determine following the hearing was whether [foster parents'] home is the permanent home which is in [A.C.'s] best interests....
>
> ....
>
> So when I look at the strengths that [foster parents' family has], which they do, as well as the significant concerns that had been raised and the fact that I can't predict the future, what it boils down to really for the Court at this point is how much of a gamble am I to take on whether the concerns that were raised or [sic] legitimate or not? ... But as I said, I take my responsibility very seriously regarding acting in a child's best interests when I have terminated their [sic] parental rights and have put them in a position where I now am responsible for finding the most appropriate home for them that I can. And ultimately, I have to say that I felt it would be irresponsible of me if I didn't act on the concerns raised and that I am now aware exist on the basis of [the psychologist's] evaluation, the institutional abuse investigation, and the concerns raised by those such as the [therapist] in addition to the

[Department]. I don't ultimately know of the degree of the concerns raised by all those professionals will [sic] impact [A.C.] I certainly know that there certainly is that concern and that risk that they will. And that's the gamble that ultimately I had to decide I couldn't take.

> And just as I don't expect the Court or the Department to remove a child because we can, I also don't believe that we should return a child just because we can, which is why I took the time I did before entering an order in this case and wanted to review all of the exhibits fully that had been admitted. But on the basis of all that evidence, I ultimately cannot find that it is in [A.C.'s] best interests to return him to [foster parents'] home at this time.

Foster parents appeal the juvenile court's determination, contending (1) because they have a constitutionally protected liberty interest in a continued relationship with A.C., their due process rights were violated, in that their liberty interest entitled them to receive notice of the specific allegations against them before A.C. was removed; and (2) the court erred in its application of the best interests standard at the removal hearing. We first address their asserted liberty interest.

## I. Foster Parents' Asserted Liberty Interest

■ We first consider whether foster parents have a constitutionally protected liberty interest in a continued relationship with A.C. We conclude they do not. Accordingly, we do not address foster parents' related contention that their due process rights were violated.

■ The Fourteenth Amendment due process clause to the U.S. Constitution and Colorado Constitution, article II, section 25, protect individuals from arbitrary governmental restrictions on liberty interests. *People in Interest of A.M.D.*, 648 P.2d 625, 632 (Colo. 1982); *see Mathews v. Eldridge*, 424 U.S. 319, 332, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976); *Watso v. Colo. Dept. of Social Servs.*, 841 P.2d 299, 304 (Colo.1992). Thus, to establish a violation of due process, an individual must show that he or she has a protected liberty

interest. *Watso*, 841 P.2d at 304; *see A.M.D.*, 648 P.2d at 632. A familial liberty interest originates from the natural family, where parents are responsible for the care, custody, and management of their children. *See A.M.D.*, 648 P.2d at 632; *see also Troxel v. Granville*, 530 U.S. 57, 66, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000).

Unlike the natural family, foster parents derive their rights from statute. § 19–3–507(5)(a)–(c), C.R.S.2011; *see Smith v. Org. of Foster Families for Equal. & Reform*, 431 U.S. 816, 845, 97 S.Ct. 2094, 53 L.Ed.2d 14 (1977) (unlike natural family, "which has its origins entirely apart from the power of the State," foster parent-child relationship "has its source in state law and contractual arrangements"). Foster parents' rights are derived from a contractual relationship with the State of Colorado acting as *parens patriae*—sovereign guardian—to safeguard the interests of vulnerable children within the state. *L.G. v. People*, 890 P.2d 647, 654 (Colo.1995). The State's overriding interest is the best interests of the children whom it is seeking to place. *See* § 19–1–102(1)(c), C.R.S.2011 (purpose of Children's Code is ultimately "for the courts to proceed with all possible speed to a legal determination that will serve the best interests of the child"). Thus, foster parents must be recruited, trained and screened to ensure they provide a safe and healthful environment for the child. *See* Dep't of Human Servs. Reg. No. 7.500.31(B), (D), 12 Code Colo. Regs. 2509–6 ("Foster parents shall be recruited who demonstrate a genuine interest in and knowledge of children and a concern for their proper care and well-being" and are required to undergo an "application and certification process.").

In rejecting a comparable due process challenge to New York State procedures allowing the removal of a child from foster care, the United States Supreme Court held:

A biological relationship is not present in the case of the usual foster family. But biological relationships are not [the] exclusive determination of the existence of a family. The basic foundation of the family in our society, the marriage relationship, is of course not a matter of blood relation.

Yet its importance has been strongly emphasized in our cases:

We deal with a right of privacy older than the Bill of Rights[,] older than our political parties, older than our school system. Marriage is a coming together for better or for worse, hopefully enduring, and intimate to the degree of being sacred. It is an association that promotes a way of life, not causes; a harmony in living, not political faiths; a bilateral loyalty, not commercial or social projects. Yet it is an association for as noble a purpose as any involved in our prior decisions.

Thus the importance of the familial relationship, to the individuals involved and to the society, stems from the emotional attachments that derive from the intimacy of daily association, and from the role it plays in "promot(ing)" a way of life" through the instruction of children, as well as from the fact of blood relationship. No one would seriously dispute that a deeply loving and interdependent relationship between an adult and a child in his or her care may exist even in the absence of blood relationship. At least where a child has been placed in foster care as an infant, has never known his natural parents, and has remained continuously for several years in the care of the same foster parents, it is natural that the foster family should hold the same place in the emotional life of the foster child, and fulfill the same socializing functions, as a natural family. For this reason, we cannot dismiss the foster family as a mere collection of unrelated individuals.

But there are also important distinctions between the foster family and the natural family. First, unlike the earlier cases recognizing a right to family privacy, the State here seeks to interfere, not with a relationship having its origins entirely apart from the power of the State, but rather with a foster family which has its source in state law and contractual arrangements. The individual's freedom to marry and reproduce is "older than the Bill of Rights." Accordingly, unlike the property interests that are also protected

by the Fourteenth Amendment, the liberty interest in family privacy has its source, and its contours are ordinarily to be sought, not in state law, but in intrinsic human rights, as they have been understood in "this Nation's history and tradition." Here, however, whatever emotional ties may develop between foster parent and foster child have their origins in an arrangement in which the State has been a partner from the outset. While the Court has recognized that liberty interests may in some cases arise from positive-law sources, in such a case, and particularly where, as here, the claimed interest derives from a knowingly assumed contractual relation with the State, it is appropriate to ascertain from state law the expectations and entitlements of the parties. In this case, the limited recognition accorded to the foster family by the New York statutes and the contracts executed by the foster parents argue against any but the most limited constitutional "liberty" in the foster family.

*Smith,* 431 U.S. at 843–46, 97 S.Ct. 2094 (footnotes omitted) (citations omitted).

A.C. has not "remained continuously for several years in the care of the same foster parents." *Id.* at 844, 97 S.Ct. 2094. Furthermore, nothing in the record leads us to conclude that foster parents "hold the same place in the emotional life of [A.C.], and fulfill the same socializing functions, as a natural family," *id.,* to such a level that would give rise to a constitutionally protected liberty interest.

Foster parents have not cited any other specific provisions of Colorado law that would grant them rights from which a protected liberty interest might be derived. *See* § 19–3–702(5)(b), C.R.S.2011 (trial court "may" consider whether the foster parents are capable and willing to provide a stable and permanent environment at a permanency hearing but is not required to do so).

Other divisions of our court have reached similar conclusions. *See, e.g., People in Interest of A.M.,* —— P.3d ——, ——, 2010 WL 5621076 (Colo.App.2010) (*cert. granted* Aug. 1, 2011)(foster parent's relationship with child does not give rise to constitutionally protected liberty interest at termination of parental rights hearings); *People in Interest of A.W.R.,* 17 P.3d 192, 197 (Colo.App.2000) ("foster mother ... was not entitled to the procedural protections of the due process clause of the federal or state constitution").

Foster parents' claim that they are "prospective adoptive parents" does not change this result. Prospective adoptive parents might have a realistic expectation that a court enter a final decree of adoption after it considers a petition for adoption. § 19–5–210(1), (2)(b), (d), C.R.S.2011. They must still wait, however, for a court to determine after a hearing whether it is "satisfied" that, among other things, the best interests of the child are served by the adoption. *Id.* Moreover, foster parents, while they had indicated an interest in adopting A.C., did not present evidence that they had even filed a petition for adoption.

Foster parents' reliance on *Rivera v. Marcus,* 696 F.2d 1016, 1024 (2d Cir.1982) and *Thelen v. Catholic Soc. Servs.,* 691 F.Supp. 1179, 1184 (E.D.Wis.1988), for the proposition that they have a liberty interest in the continuation of their relationship with A.C., is misplaced. In *Rivera,* the foster parent was the half-sister of the children, she had cared for the children "almost from birth" and continued to function as the children's "surrogate mother" after the children's mother was institutionalized. 696 F.2d at 1017–18, 1024. Conversely, foster parents have no biological relation to A.C.; did not care for A.C. before the Department placed him in their home; and had not lived with A.C. for several years before the Department removed him. In *Thelen,* Wisconsin statutes created a "limited" liberty interest during a mandatory six-month waiting period before pre-adoptive parents could file a petition to adopt a child. 691 F.Supp. at 1184–85. In contrast, the General Assembly has created no such interest. While foster parents were a potential adoptive home, their home was only certified as a foster home, and they had not signed the adoption agreement that must precede an adoption petition in Colorado. *See* Dep't of Human Servs. Reg. No. 7.710.59(F), 12 Code Colo. Regs. 2509–8.

## II. Best Interests Standard

■ Foster parents also contend the juvenile court erred in its application of the best interests standard at the removal hearing. We read their contention as a challenge to the sufficiency of the evidence supporting the court's findings. Our initial review of the record indicated the court may have used an incorrect standard of review in making its findings at that hearing. We therefore ordered the parties to provide supplemental briefing on this question. *See* C.A.R. 3.4(j)(2) ("After reviewing the petition on appeal, any response, and the record, the Court of Appeals may . . . set the case for supplemental briefing on issues raised by the parties or noticed by the court."). We conclude it did.

■ This case requires us to interpret provisions of Colorado's Children's Code concerning children's placement in permanent homes. We review de novo questions of law. *People in Interest of A.J.L.*, 243 P.3d 244, 249 (Colo.2010)(citing *Freedom Colo. Info., Inc. v. El Paso Cnty. Sheriff's Dep't*, 196 P.3d 892, 897 (Colo.2008)).

One of the purposes of the Children's Code is to assist children removed from their natural parents to become "responsible and productive" members of society. § 19–1–102(1)(d), C.R.S.2011. It is therefore in the best interests of the removed child: (1) to be placed in a stable and secure environment; (2) not to be indiscriminately moved from foster home to foster home; and (3) to have assurance of long-term permanency planning. § 19–1–102(1.5)(a)(I)(III), C.R.S.2011. "In order to provide stable permanent homes for children in as short a time as possible, a court on its own motion or upon motion brought by any party shall conduct a permanency hearing if a child cannot be returned home." § 19–3–702(1), C.R.S.2011.

Children under the age of six years who have been removed from their homes should be placed in permanent homes as expeditiously as possible. § 19–1–102(1.6), C.R.S. 2011. A child undergoes a "critical bonding and attachment process" and will suffer "significant emotional damage" that could lead to chronic psychological problems and antisocial behavior if the child has not bonded with a primary adult before age six. *Id.* Thus, children under age six at the time the petition in dependency and neglect is filed must be placed in permanent homes within twelve months of the original out-of-home placement, unless a court determines a placement delay is in the child's best interests.

Section 19–3–703, C.R.S.2011, provides in pertinent part:

[I]f a child is under six years of age at the time a petition is filed in accordance with section 19–3–501(2), [C.R.S. 2011,] the child shall be placed in a permanent home no later than twelve months after the original placement out of the home unless the court determines that a placement in a permanent home is not in the best interests of the child at that time. In determining whether such a placement delay is in the best interests of the child, the court must be shown clear and convincing evidence that reasonable efforts, as defined in section 19–1–103(89), [C.R.S. 2011,] were made to find the child an appropriate permanent home and such a home is not currently available or that the child's mental or physical needs or conditions deem it improbable that such child would have a successful permanent placement. The caseworker and the child's guardian ad litem shall provide the court with a report specifying which services are being given the child in order to remedy the child's problems. The case shall be reviewed at least every six months until the child is permanently placed. The six-month reviews and twelve-month permanency hearings shall continue as long as the child remains in foster care. Clear and convincing standards of evidence shall be applicable at any such review. For the purposes of this section, a permanent home shall include, but not be limited to, the child's reunification with the child's parents; placement with a relative, with a potential adoptive parent, or permanent custody granted to another; or, if the child cannot be returned home, placement in the least restrictive level of care.

Accordingly, the court must find any delay in a young child's placement in a permanent

home to be in the "child's best interests." § 19–3–703. To make this finding, the court must be shown, by "clear and convincing evidence," that either (1) reasonable efforts were made to find the child an appropriate permanent home and such a home was not currently available; or (2) the child's mental or physical needs or conditions deem it improbable that such child would have a successful permanent placement. *Id.*

We conclude A.C. was in a "permanent home" within the meaning of section 19–3–703 because he had been placed out of his home for longer than a year and currently was in the home of potential adoptive parents. A.C.'s removal from this presumptively permanent home effectively delayed his placement in a permanent home. In these circumstances, we perceive no reason to treat A.C. differently from young children in other cases in which courts are asked to delay placement in a permanent home. Accordingly, we conclude that, here, the Department was required to show, by clear and convincing evidence, that (1) it was making "reasonable efforts" to find A.C. an appropriate permanent home, and (2) concerns about foster mother rendered that foster home "not currently available." The juvenile court's findings do not reflect that the Department made such a showing.

In light of our holding, we need not address foster parents' remaining contentions.

Accordingly, we affirm in part and remand for further proceedings. On remand, the juvenile court must determine whether A.C. is now in a permanent home within the definition of section 19–3–703. If A.C. is in a permanent home, he may not be removed from that home unless the Department shows, by clear and convincing evidence, that either (1) reasonable efforts were made to find him an appropriate permanent home and such a home was not currently available; or (2) his mental or physical needs or conditions deem it improbable that he would have a successful permanent placement. *See* § 19–3–703; *see also* § 19–1–102(1.5)(a)(II) (the child shall not be moved indiscriminately from foster home to foster home). If A.C. is not in a permanent home within the definition of section 19–3–703, the court must determine whether foster parents' home is still an available foster home. If foster parents' home is available, the court must return A.C. to foster parents after a permanency hearing unless the Department shows, by clear and convincing evidence, that concerns about foster mother rendered foster parents' home "not currently available."

To the extent that section 19–3–702(9), C.R.S.2011, permits the juvenile court to consider all pertinent information related to modifying the placement of a child, in light of the time-sensitive nature of the case, the court may re-evaluate the testimony and evidence from the prior hearing to aid its determination.

The order is affirmed in part and remanded for further proceedings.

Judge GABRIEL and Judge RICHMAN concur.